**LONG ISLAND SAVINGS BANK, FSB, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 92–517C.**

United States Court of Federal Claims.

Feb. 27, 2004.

Richard C. Tufaro, Milbank, Tweed, Hadley & McCloy LLP, Washington, D.C., argued for plaintiffs. With him on the briefs were David S. Cohen, Andrew M. Leblanc, and Kelly J. Rock.

Jerome A. Madden, Trial Attorney, and Jonathan S. Lawlor, Trial Attorney, Commercial Litigation Branch, Department of Justice, Washington, D.C., argued for defendant. With them on the briefs were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, Cheryl Evans, and John Jay Hoffman, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This *Winstar*-related case [1] is before the Court on cross-motions for summary judgment on damages.[2] Following briefing, a hearing was held on November 25, 2003. Because genuine issues of material fact exist regarding expectancy damages, plaintiffs' motion is denied and defendant's motion is denied in part and granted in part.[3]

## BACKGROUND

The Long Island Savings Bank was organized in 1876 as a New York State chartered mutual savings bank. Def.'s App., Ex. 42 at WOQ632 1702 (Long Island Bancorp's Prospectus (Feb. 14, 1994)). Headquartered in Syosset, New York, the bank converted to a federal mutual savings bank in December 1982 and changed its name to The Long Island Savings Bank, FSB ("Syosset"). *Id.* Historically, the institution operated by attracting deposits and investing in mortgage

---

**1.** *See Winstar Corp. v. United States*, 25 Cl.Ct. 541 (1992) ("*Winstar I*"), aff'd, 64 F.3d 1531 (Fed. Cir.1995) (en banc) ("*Winstar II*"), aff'd, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) ("*Winstar III*").

**2.** Liability remains at issue. Previously, both plaintiffs and defendant filed motions for summary judgment on liability, and on April 10, 2001, those motions were denied by Senior Judge Margolis of this Court on the ground "that there are genuine issues of material fact with respect to the plaintiffs' breach of contract claims." Order of April 10, 2001. Trial on liability has not yet been held. As a supplement to the currently pending motions on damages, plaintiffs seek to renew their motion for summary judgment on liability. However, they have not shown good cause for reconsideration of the Court's prior denial of such a motion. *See Rice Servs. Ltd. v. United States*, 59 Fed.Cl. 619 (2004); *Bannum, Inc. v. United States*, 59 Fed.Cl. 241 (2003). Because liability has not yet been established, the pending cross-motions respecting damages assume that a contract existed and was breached.

**3.** On December 9, 2002, Senior Judge Margolis granted a motion by plaintiffs for summary judgment on defendant's counterclaims and affirmative defenses. *Long Island Sav. Bank v. United States*, 54 Fed.Cl. 607 (2002) (rejecting the government's claim of forfeiture based on fraud and the related claims that any contract in this case is unenforceable because of fraud, that such contract should be rescinded, and that plaintiffs' prior material breach precludes damages).

loans secured by homes in the community and mortgage-backed securities. *Id.* In 1982, Syosset operated twelve branches, most of which were located in Queens County, with others in Nassau and Suffolk Counties on Long Island, New York. *Id.*, Ex. 1 at ¶ 26 and Ex. 6 (Carron Report (Apr. 12, 2000)). It had approximately $1.3 billion in assets. *Id.*, Ex. 36 at CLI016 0459 (Federal Home Loan Bank Board ("FHLBB" or "Bank Board") Issue Memo (Aug. 8, 1983)). Syosset avers that its conversion to a federal thrift charter occurred in connection with negotiations with the Federal Savings and Loan Insurance Corporation ("FSLIC") for the acquisition of thrift assets controlled by FSLIC. Compl. at ¶ 26.

The thrift assets about which Syosset was negotiating with FSLIC were held by Suffolk County Federal Savings and Loan Association ("Suffolk Phoenix"). That institution came into existence as the result of a merger in April 1982 under FSLIC's "Phoenix program"[4] of two failing thrifts. Def.'s App., Ex. 41 (FHLBB Resolution No. 82–263 (April 14, 1982)).[5] As part of the merger under the Phoenix program, Suffolk Phoenix received $62 million from FSLIC in the form of interest-bearing notes in exchange for income capital certificates ("ICCs") and net worth certificates ("NWCs"). *Id.*, Ex. 38 at PLI002 0521 (Suffolk County FS & LA and Subsidiaries Consolidated Financial Statements (Dec. 31, 1982)). Additionally, in accordance with the purchase method of accounting, the fair market value of Suffolk Phoenix's liabilities exceeded that of its assets by approximately $741 million, which amount Suffolk Phoenix booked as goodwill amortizable over a forty-year period on the straight-line method. *Id.* The Phoenix pro-

gram merger, however, did not successfully resuscitate the failed institutions. Based on Suffolk Phoenix's losses for the six months ended June 30, 1983, FHLBB determined that Suffolk Phoenix would become insolvent in less than a year without further assistance. *Id.*, Ex. 40 at CLI002 1330 (FHLBB S–Memorandum (Aug. 11, 1983)).

On December 20, 1982, FSLIC held a bidders' conference to solicit bids for a FSLIC-assisted acquisition of Suffolk Phoenix. *Id.*, Ex. 36 at CLI016 0460 (FHLBB Issue Memo (Aug. 8, 1983)). Of the bids received, the Bank Board determined that Syosset's bid was "the least costly alternative solution to Suffolk [Phoenix's] problems" and selected it over those of the other potential acquirers. *Id.*

As part of Syosset's acquisition of Suffolk Phoenix, Suffolk Phoenix converted to a federal stock savings bank and changed its name to The Long Island Savings Bank of Centereach FSB ("Centereach"). *Id.*, Ex. 27 at 1 (Assistance Agreement (Aug. 17, 1983)). Syosset purchased all of Centereach's stock for $100,000 cash, thereby acquiring Centereach as a wholly owned subsidiary. *Id.* Concurrently, Syosset, Centereach, and FSLIC entered into an assistance agreement under which (1) FSLIC contributed $75 million to Centereach as a direct contribution to Centereach's net worth, *id.* at § 3(a); (2) FSLIC paid Syosset $63 million in the form of a five-year promissory note in return for an income capital certificate in the same amount issued by Syosset, *id.* at § 5(b); (3) Syosset assumed responsibility for the $62 million of outstanding ICCs and NWCs that Suffolk Phoenix had issued, *id.* at § 9(c)(3)-(4); (4) Syosset undertook to maintain Centereach's net worth at the level required by regulation

---

4. The Federal Circuit has explained that the Phoenix program was devised

> to consolidate several failing or failed thrifts into a single association that would not only achieve efficiencies and receive close regulatory oversight, but would also receive significant assistance from the federal government. This assistance included direct monetary contributions, regulatory forbearances, and authorization to use a purchase accounting system whereby assets and liabilities would be revalued at market price and the ensuing net liability would be recorded as an asset called 'super-

> visory goodwill' and accorded an extended amortization term.

> *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1367 (Fed.Cir.2003).

5. The two thrifts were County Federal Savings and Loan Corporation which operated primarily in southern Nassau County with branches in Manhattan, Brooklyn, Suffolk County, and upstate New York, and Suffolk County Federal Savings and Loan Association which operated exclusively in Suffolk County. Def.'s App., Ex. 1 at ¶ 26.

for institutions insured for twenty years or more, provided that Syosset would maintain Centereach's net worth at 1% of Centereach's liabilities for ten years following the date of acquisition, *id.* at § 9(a); and (5) Syosset could apply pre-SFAS 72 accounting principles [6] with regard to amortization of goodwill and use push-down accounting to account for the acquisition. *Id.* at § 10. Pursuant to the agreement, Centereach recorded on its audited financial statements approximately $625.4 million of supervisory goodwill, which was to be amortized over forty years. *Id.*, Ex. 46 at PLI005 116, 119–20 (Consolidated Financial Statements of Syosset and subsidiaries (Sept. 30, 1983 and 1982)). Such financial statements were submitted to the Bank Board. Fuster Decl., Ex. O (acknowledgment of receipt (June 4, 1984)).

After the acquisition, Syosset and Centereach reported separately for regulatory purposes, but the two entities operated on a coordinated basis. Def.'s App., Ex. 1, ¶ 26. Syosset's acquisition of Centereach enabled Syosset to expand its operations in the Long Island service area. In terms of the banks' total branches and consolidated assets, Syosset almost tripled in size through the acquisition. *Id.*, Ex. 53 at PLI243 869 (General Audit Plan of Syosset and subsidiaries (Sept. 30, 1988)). Additionally, in April 1986, Syosset acquired, with FSLIC's assistance, Flushing Federal Savings and Loan Association, which had approximately $422 million in assets and eight branches located in Queens, Nassau, and Suffolk counties. Cohen Decl., Ex. U at LIP0148531 (Consolidated Financial Statements of Syosset and subsidiaries (Sept.

30, 1986 and 1985)). Centereach also sold several branches that were located outside the tri-county area, Cohen Decl., Ex. K at 413:25–414:12 (Fuster dep. (Apr. 20, 1999)); Def.'s App., Ex. 60 at WOQ621 1401 (Capital Plan for Centereach (Jan. 8, 1990)), and opened and closed other branches. Def.'s App. Ex. 1, ¶ 26. By 1993 Syosset and Centereach together had 48 branches located in Queens, Nassau, and Suffolk Counties. *Id.*

Plaintiffs allege that Syosset operated Centereach in the same conservative manner in which it had previously operated Syosset, *id.*, Ex. 57 at 41:15–42:5 (Viklund dep. (June 8, 1999)), and that Centereach grew "slowly and carefully." *Id.*, Ex. 60 at WOQ621 1400 (Capital Plan for Centereach (Jan. 8, 1990)). Centereach held approximately $1.97 billion of deposits in 1983 and grew to approximately $2.26 billion in 1989. *Id.*, Ex. 18 at Ex. F (Bankhead Report (Apr. 24, 2000)).

The enactment on August 9, 1989 of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. 101–73, 103 Stat. 183 (codified in scattered sections of Title 12 of the U.S.Code, including 12 U.S.C. § 1464), prohibited thrifts from counting goodwill toward regulatory net worth.[7] The Office of Thrift Supervision ("OTS"), the successor to the Bank Board under FIRREA, promulgated interim regulations implementing FIRREA's new capital requirements on November 8, 1989, to be effective December 7, 1989. 54 Fed.Reg. 46,845 (Nov. 8, 1989). Additionally, on November 6, 1989, OTS issued Thrift Bulletin 36, which provided that a thrift not in compliance with all of the capital requirements would receive "more

---

6. Prior to the promulgation of Statement of Financial Accounting Standards No. 72 ("SFAS 72") by the Financial Accounting Standards Board ("FASB"), thrifts were allowed to accrete the discount resulting from the mark-to-market over the average life of the loans and at the same time amortize the goodwill over a longer period. A thrift would thereby show a "gain" in the earlier years following a supervisory merger. *See Winstar III*, 518 U.S. at 852–55, 116 S.Ct. 2432; *American Fed. Bank, FSB v. United States*, 58 Fed.Cl. 429, 431 n. 3 (2003). SFAS 72 "eliminated any doubt that the differential amortization periods on which acquiring thrifts relied to produce paper profits in supervisory mergers were inconsistent with GAAP." *Winstar III*, 518 U.S. at 855, 116 S.Ct. 2432.

7. FIRREA imposed new capital requirements as follows: "tangible" capital was to be maintained at a level "not less than 1.5 percent of the savings association's total assets," "core" capital was required to be "not less than 3 percent" of total assets, and "risk-based" capital was required to be kept at a level not "materially" lower than that required for national banks. 12 U.S.C. § 1464(t)(2). Supervisory goodwill and other unidentifiable intangible assets could not be counted toward tangible capital and were to be phased out of calculations for "core" capital by 1995. *Id.* § 1464(t)(3)(A), (t)(9)(A)-(C).

than normal supervision" and could not, absent approval of the responsible OTS District Director, "(1) grow beyond net interest credited, (2) make any capital distributions, or (3) act inconsistently with any applicable operating restrictions and limitations." Def.'s App., Ex. 32 at 1. A post-FIRREA non-complying thrift was given the opportunity to submit a "capital plan" to OTS that at a minimum had to "[d]emonstrate that the savings association [could] meet applicable capital standards by no later than December 31, 1994." *Id.* at 2 (emphasis omitted).[8]

At the end of 1989, Centereach was not in compliance with FIRREA's capital requirements and would have been insolvent absent the ability to rely on supervisory goodwill as regulatory capital. Fuster Decl., Ex. P at WOP333 0076 (OTS Internal Memorandum (Apr. 19, 1991)); *id.*, Ex. Q at WOR567 0186 (OTS Memorandum from John Robinson (Apr. 30, 1990)) ("Centereach fails its capital requirements in a big way because of the large amount of [g]oodwill still on its books.").[9] By contrast, Syosset exceeded capital requirements on a stand-alone basis. *Id.* at WOR567 0186–87. On a consolidated basis, the banks would have had $29 million of negative tangible capital. *Id.*

In accord with Thrift Bulletin 36, Centereach filed a capital plan on January 8, 1990. Def.'s App., Ex. 60. Approval of the plan was delayed because OTS initially sought to require Syosset and Centereach to consolidate as a condition for approval of the plan. *Id.*, Ex. 65 at WOR736 86 (OTS Memorandum for the Director (Apr. 30, 1990)). At a meeting with OTS, the banks responded that such a consolidation would result in Syosset becoming capital deficient and would violate the Assistance Agreement. *Id.*, Ex. 66 at WOR555 1051 (Internal Memorandum from Ruth Ann Popielarski to File (May 1, 1990)); *id.*, Ex. 68 at WOP333 60–61 (Internal Mem-

orandum from Joseph P. Kehoe to the files (May 8, 1990)).[10] OTS eventually relented regarding consolidation, *id.*, Ex. 70 (Letter from Angelo A. Vigna, District Director, OTS, to William E. Viklund (Aug. 24, 1990)), and Centereach submitted a second capital plan on October 25, 1990, under which Syosset agreed to make additional capital contributions to Centereach. *Id.*, Ex. 72 at WOP286 1170–72.

OTS conditionally approved Centereach's second capital plan on May 22, 1991, *id.*, Ex. 74 (Letter from Angelo A. Vigna, Regional Director, OTS, to Centereach's Board of Directors), and gave its final conditional approval on October 30 of that year. *Id.*, Ex. 28 (Letter from Angelo A. Vigna, Regional Director, OTS, to Centereach's Board of Directors). During the period in which Centereach's capital plan was under review, OTS allowed the bank to grow to the extent of net interest credited. *Id.*, Ex. 64 (Letter from Angelo A. Vigna, District Director, OTS, to James J. Conway (Feb. 23, 1990)). Likewise, OTS's final approval letter limited Centereach's growth to the same level after January 1, 1991, and imposed other conditions, including a prohibition on capital distributions, limits on compensation for directors, officers, and other employees, and requirements for quarterly evaluations and reports by the board of directors. *Id.*, Ex. 28 at PLI097 0275–78. The capital plan required the boards of directors for Syosset and Centereach to determine by no later than June 30, 1994, the method by which Syosset–Centereach would be recapitalized as of December 31, 1994. *Id.*, Ex. 87 (letter from Angelo V. Vigna, Regional Director, OTS, to Syosset and Centereach Boards of Directors (Dec. 23, 1992)).

The banks retained Bear, Stearns & Co., Inc. ("Bear Stearns") "to act as [their] advis-

---

**8.** A non-complying thrift was also given the option of applying for a capital exception (used only in "extraordinary situations") or a capital exemption (which had to "be accompanied by an acceptable capital plan"). Def.'s App., Ex. 32 at 1–2.

**9.** The banks had redeemed all of their capital certificates in March 1989. Def.'s App., Ex. 31 at PLI205 1653 n. 3(b), 1668 n. 18 (Consolidated

Financial Statements of Syosset and subsidiaries (September 30, 1989 and 1988)).

**10.** Consolidation at that point would have forced Syosset to file and gain approval of its own capital plan in addition to Centereach's, and Syosset would have been rendered susceptible to seizure if that capital plan were rejected. Def.'s App., Ex. 69 (Robinson dep. (April 27, 1999)).

er for financial advisory and investment banking services for recapitalization and restructuring purposes." *Id.*, Ex. 81 at PLI094 321 (Minutes of Syosset Board of Trustees Meeting (Sept. 22, 1992)); *see also id.*, Ex. 83 at PLI169 1120 (Letter from Robert A. Baer, Jr. to William E. Viklund (Oct. 21, 1992)). In presentations to the banks in September and November of 1992, Bear Stearns analyzed various restructuring alternatives. *Id.*, Ex. 82 at PLI017 333–43 (Presentation to the Special Committee (Sept. 29, 1992)); *id.*, Ex. 15 at PLI169 1755–57 (Presentation on Restructuring Alternatives, Board of Trustees Meeting (Nov. 19, 1992)). Bear Stearns's recommendation included selling $1.0 billion of branches and deposits, selling $1.25 billion of securities and loans, merging Centereach and Syosset, and writing off goodwill. *Id.*, at 1759; *id.*, Ex. 86 at PLI094 1074–75 (Minutes of Board of Trustees Meeting (Nov. 19, 1992)). The banks submitted this restructuring proposal to OTS on November 23, 1992, and a month later OTS provided written notice of its non-objection and determination that such restructuring would be considered an acceleration of the resolution of Centereach's capital deficiency as set out in Centereach's capital plan dated October 25, 1990. *Id.*, Ex. 87 (Letter from Angelo A. Vigna, Regional Director, OTS, to the Boards of Syosset and Centereach (Dec. 23, 1992)).

Syosset and Centereach began implementing the restructuring plan by arranging for a securitization and sale of home equity loans with a value of approximately $310 million. *Id.*, Ex. 85 at PLI080 1157 (Minutes of Board of Trustees Meeting (Oct. 26, 1993)). The proceeds of this sale then were combined with a reduction in cash and investments of $497 million to fund a sale of branches. *Id.*

On April 30, 1993, the banks announced that they had entered into an agreement in principle with Home Savings of America ("Home Savings") for a sale to Home Savings of ten branches in the tri-county area with approximately $950 million of deposits. *Id.*, Ex. 88 (Memorandum from William E. Vik-

lund to all employees, with attached joint press release (May 3, 1993)). Syosset, Centereach, and Home Savings entered into a Purchase of Assets and Liability Assumption Agreement on June 9, 1993, *id.*, Ex. 52, and submitted an application to OTS for approval the following month. *Id.*, Ex. 54 (Application for the Purchase of Branch Offices and Transfer of Savings Accounts (July 2, 1993)). Following approval by OTS, Cohen Decl., Ex. RR (Letter from Thomas F. Sharkey to William J. Wiley and James J. Nacos (Aug. 4, 1993)), on September 3, 1993, Syosset and Centereach ultimately sold the ten branches along with $836.3 million in deposits. Def.'s App., Ex. 42 at WOQ632 1731 (Long Island Bancorp Prospectus, (Feb. 14, 1994)).

Concurrently with this transaction, and thus subsequent to their commencement of this case (this action was filed on August 3, 1992), Syosset merged into Centereach, and the merged entity took the name The Long Island Savings Bank, FSB ("Long Island" or "Bank"). *Id.* Additionally, the banks wrote off the remaining goodwill balance, *id.* at WOQ632 1854, and adopted the accounting standards set forth in SFAS 72. *Id.* at WOQ632 1741. The cumulative effect of these actions resulted in a charge against Long Island's earnings of $370.7 million in the Bank's fiscal year ended September 30, 1993. *Id.*

Representatives of OTS and the Federal Deposit Insurance Corporation ("FDIC") closely monitored the asset sale and the subsequent sale of branches and met with the Bank's board at the end of October 1993 to review the condition of the merged entity. The FDIC's representatives observed that the restructuring activity to date "had brought capital up to 5%, but in the process, the Bank had to sell some high earning and good assets." *Id.*, Ex. 85 at PLI080 1161 (Minutes of Board of Trustees Meeting (Oct. 26, 1993)). As a consequence, the FDIC was "not yet convinced that the institution was a '2' and that may impact the Bank's risk-based premiums going forward." *Id.*[11]

---

11. The various federal agencies that regulate financial institutions, including FDIC, OTS, the Board of Governors of the Federal Reserve System, the National Credit Union Administration, and the Office of the Comptroller of the Currency, employ the Uniform Financial Ratings System ("UFIRS"), which is also known as the "CAMEL" rating system. *See* 61 Fed.Reg. 67021

As a further step toward improving its capital situation and risk profile, in December 1993 the Bank entered into a contract for the bulk sale of certain non-performing loans and real estate owned (the "Bulk Sale"). *Id.,* Ex. 89 at PLI097 1280 (Conversion Valuation Appraisal Report (Dec. 17, 1993)).[12] The book value of the loans to be sold was approximately $142.0 million, and that of the real estate to be sold was about $14.0 million. *Id.* The sale of the loans was consummated by December 31, 1993, and the sale of the real estate owned was completed shortly thereafter. *Id.,* Ex. 92 at PLI150 0238. On September 30, 1993, the values of the assets involved in the Bulk Sale were revalued to market based on the sales price established in the Bulk Sale. *Id.* As a result of this series of restructuring actions, total assets of the Bank declined to $4.0 billion as of September 30, 1993, from $5.6 billion as of September 30, 1992. *Id.*

In late 1993, Long Island began the process of converting from a federal mutual savings bank to a stock company. The bank retained RP Financial, Inc. to provide an appraisal of the pro forma market value of the common stock to be issued in connection with the conversion and reorganization using a newly formed holding company, Long Island Bancorp, Inc. ("Long Island Bancorp"), *id.,* Ex. 89 (Conversion Valuation Appraisal Report (Dec. 17, 1993)), and prepared a business plan for the period through September 30, 1997, in support of its conversion application. *Id.,* Ex. 90. The conversion was completed on April 14, 1994, using the holding company structure and realizing $264.2 million of net proceeds from the initial public offering ("IPO"). *Id.,* Ex. 92 at PLI150 0237 (Long Island Bancorp, Inc.'s 1994 Annual Report). Of these proceeds, $100.2 million was retained at the holding company level, and $164.0 million was remitted to the Bank in exchange for all of its issued and outstanding common stock. *Id.*[13]

By September 30, 1994, Long Island had "a strong capital level of $493.7 million, representing 10.9 percent of total assets." *Id.* at PLI150 0222. Long Island Bancorp undertook a modest expansion. In November 1994, it acquired eleven loan servicing and lending offices from Entrust Financial Corporation and a retail lending office from Developer's Mortgage Corporation, expanding its loan servicing and lending operations to include Pennsylvania, Delaware, Maryland, Virginia, and Georgia. *Id.,* Ex. 93 at PLI102 1501 (Long Island Bancorp, Inc.'s 1995 Annual Report). Long Island Bancorp also made payments to its stockholders. Between 1995 and 1997, Long Island Bancorp paid $32.242 million of dividends on its common stock and repurchased an aggregate of 3,230,054 shares of common stock at a total cost of $83.9 million. *Id.,* Ex. 95 at PLI102 0426 (Long Island Bancorp, Inc.'s 1997 Annual Report).

---

(Dec. 19, 1996). UFIRS is promulgated by the Federal Financial Institutions Examination Council, an interagency body created by statute and charged with "establish[ing] uniform principles and standards and report forms for the examination of financial institutions which shall be applied by the Federal financial institutions regulatory agencies." 12 U.S.C. § 3305(a). The rating system was first adopted in 1979 and updated in 1996. 61 Fed.Reg. 67021. Under UFIRS, a financial institution receives a numerical "composite rating" between one and five upon examination by a regulatory body. *See generally Southern California Fed. Sav. & Loan Ass'n v. United States,* 57 Fed.Cl. 598, 605–06 (2003).

A rating of 1 is the strongest, reflecting that the institution is "sound in every respect ... and give[s] no cause for supervisory concern." 61 Fed.Reg. at 67025–26. A rating of 2 indicates that the institution is "fundamentally sound ..., [and] supervisory response is informal and limit-

ed." *Id.* at 67026. A rating of 3 indicates that the institution is "less capable of withstanding business fluctuations ... [and] require[s] more than normal supervision." *Id.* A rating of 4 indicates that the institution "exhibits unsafe and unsound practices or conditions ..., [c]lose supervisory attention is required ..., [and][f]ailure is a distinct possibility." *Id.* Finally, a rating of 5 is the weakest, indicating that the institution exhibits "extremely unsafe and unsound practices or conditions ..., [o]ngoing supervisory attention is necessary ..., [and] failure is highly probable." *Id.*

**12.** On a book-value basis, approximately $110.0 million of the loans were non-performing, and approximately $32.0 million were performing. *Id.,* Ex. 42 at WOQ632 1742. The real estate owned was derived from foreclosures and transfers in lieu of foreclosures.

**13.** Syosset had previously infused approximately $9 million into Centereach. Hr'g Tr. at 114–15.

On April 3, 1998, Long Island Bancorp and Astoria Financial Corporation announced their agreement to merge by an exchange of common stock. Cohen Decl., Ex. AAA (Astoria Financial Corp. news release (Apr. 3, 1998)). The transaction was completed on September 30, 1998, with Long Island and Long Island Bancorp merging into Astoria Federal Savings and Loan Association and Astoria Financial Corp., respectively. Def.'s App., Ex. 98 at VLI006 274 (Rochester Report (Apr. 12, 2000)).

## ANALYSIS

### A. Standard For Decision

Summary judgment is appropriate if there is "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rules of the United States Court of Federal Claims ("RCFC") 56(c). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" only if it "may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250, 106 S.Ct. 2505. A fact is "material" if it would affect the outcome of the case. Id. at 248, 106 S.Ct. 2505. In considering the existence of a genuine issue of material fact, a court must draw all inferences in the light most favorable to the non-moving party. Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In considering cross-motions for summary judgment, a court must evaluate each motion on its own merits and resolve any reasonable inferences against the party whose motion is being considered. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390–91 (Fed.Cir.1987). Both motions must be denied if genuine disputes exist over material facts. Id.

### B. Synopsis Of The Parties' Claims

This case has many factual similarities to LaSalle Talman Bank, FSB v. United States, 317 F.3d 1363 (Fed.Cir.2003), and the Federal Circuit's decision in that case provides an analytical template for the Court's evaluation of the pending cross-motions for summary judgment.

Long Island seeks damages of not less than $288.6 million, based upon an expectancy measure keyed to the cost of replacing the goodwill used as regulatory capital with tangible capital as of the date of the breach, i.e., December 7, 1989, the effective date of regulations implementing FIRREA. Pls.' Mot. at 19–22. Alternatively, Long Island seeks expectancy damages in the same amount premised upon lost profits coupled with incidental losses incurred in its efforts to avoid or mitigate loss or damage. Id. at 29–31. As a third optional route to relief, Long Island invokes the doctrine of restitution to support an award of damages that is not less than $316.1 million. Id. at 25–28.[14]

By contrast, the government argues that Long Island, as a matter of law, should be denied nearly all of the damages it seeks. It contends that Long Island was able to mitigate the effects of the FIRREA breach through the implementation of the capital plan approved by OTS. Def.'s Resp. at 20. The government avers that Long Island "sought, and received, a five-year exemption from FIRREA's new capital requirements," and under the capital plan it was able to effect a "substitute performance" that obviated nearly all damages that might otherwise have been attributable to the breach. Id. At most, the government asserts that Long Island is entitled only to its incidental losses in preparing the capital plan and in implementing it.[15]

14. Long Island thus draws upon two of the three general classes of contractual damages recognized by the Restatement (Second) of Contracts ("Restatement Contracts") § 344, viz., remedies protecting a promisee's "expectation interest" and "restitution interest." See also Globe Sav. Bank, FSB v. United States, 59 Fed.Cl. 86, 92 n. 9 (2003). At an earlier stage in the proceedings in this case, Long Island also put forward a request for relief based upon a reliance interest, the third class of contractual damages described in the

Restatement Contracts, but Long Island now has conceded that such optional request can no longer be maintained in light of precedent and its other asserted grounds for relief. Hr'g Tr. at 109.

15. The government concedes that it should be liable in judgment only for "wounded bank damages" that are "related to the preparation of the capital plan up to the time that [Long Island]

## C. Expectancy Damages

■ Compensation through money damages is the primary means of redressing a breach of contract. 24 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 64:1 at 4–5 (4th ed.2002) (hereafter "*Williston*"). The principle underlying the availability of contract damages is that the promisee is entitled to the benefits it reasonably expected to receive had the breach not occurred, *i.e.*, the profits it would reasonably have earned but for the breach. *LaSalle Talman*, 317 F.3d at 1371 (citing *United States v. Behan*, 110 U.S. 338, 345, 4 S.Ct. 81, 28 L.Ed. 168 (1884)); *see also Restatement Contracts* § 344(a) & cmt. a (courts ordinarily provide a remedy for a breach of contract by "protecting the expectation that the injured party had when [it] made the contract"). Such "expectancy damages" are often fashioned in terms of profits lost but may include other damage measures. *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed.Cir.2001) (citing *Restatement Contracts* § 347); *see also Williston* § 64:2 at 30 (expectancy damages include lost profits and other consequential harm caused by the breach).

Two overarching issues—concerning mitigation and causation—bear on the parties' claims and defenses, and they should be addressed as an initial matter to provide a foundation for further analysis.

### 1. Mitigation.

■ An injured party is required to take reasonable steps to mitigate its loss upon a breach of a contract. *See generally Williston* § 64:27 at 191–200. It may not recover "for loss that the injured party could have avoided without undue risk, burden or humiliation," but such a party "is not precluded from recovery ... to the extent that he has made reasonable but unsuccessful efforts to avoid loss." *Restatement Contracts* § 350.

The government argues that its offer to Long Island of substitute performance in the form of the capital-plan approval resulted in virtually no damages incurred by Long Island. Hr'g Tr. at 99–100. Although the government does not cite the *Restatement Contracts* in this regard, its contention in effect looks solely to the first half of the rule stated in *Restatement Contracts* § 350. The government overlooks the other half of the rule found in Subsection (2), which provides that the injured party may recover damages where it has made reasonable efforts but failed fully to mitigate loss.

In short, the government starts down a proper analytical path to evaluate Long Island's efforts to mitigate the government's breach, but the government stops short of the critical further inquiry whether Long Island nonetheless suffered damage despite reasonable mitigation efforts. This posture by the government contravenes the teachings of *LaSalle Talman*. In that decision, the Federal Circuit ruled that post-breach efforts at mitigation had to be taken into account in addressing damages. *See LaSalle Talman*, 317 F.3d at 1366 ("damages due to the breach are subject to offset or mitigation by the benefits of the actions taken after the breach").[16] However, consideration of post-breach events only goes so far; it "is limited to actions reasonably directly related to the breach and its proximate consequences." *Id.* As the Court of Appeals said, "unrelated events and remote consequences do not reduce the liability of the wrongdoer for the losses caused by the wrong." *Id.* at 1373.

Long Island avers that it attempted to mitigate in two ways. First, under the capital plan it was forced to shrink by way of the 1993 sale of assets and branches and its subsequent Bulk Sale, giving rise to its lost-profits claim. Pls.' Mot. at 29. "[T]he shrink strategy employed by plaintiff was a

---

achieved compliance with FIRREA's capital regulations." Def.'s Mot. at 3 n. 4.

**16.** In *LaSalle Talman*, the Court of Appeals quoted *Restatement Contracts* § 347, cmt. e: "If [the non-breaching party] makes an especially favorable substitute transaction, so that he sustains a smaller loss than may have been expected, his damages are reduced by the loss avoided as a

result of the transaction." *LaSalle Talman*, 317 F.3d at 1372 (quoting this *Restatement* comment). Conversely, the mitigating effort might produce unfavorable results, which correspondingly also should be taken into account so long as the effort at mitigation was reasonable. *Id.* at 1373.

form of mitigation." *Commercial Fed. Bank, FSB v. United States,* 59 Fed.Cl. 338, 355 (2004). *See also Westfed Holdings, Inc. v. United States,* 55 Fed.Cl. 544, 562 (2003). Second, also in connection with the capital plan, Syosset in effect made capital infusions into Centereach first of $9.0 million and then of $164.0 million, which efforts support a cost-of-replacement-capital claim. Hr'g Tr. at 114–15. These capital injections were also a type of mitigation. *LaSalle Talman,* 317 F.3d at 1372; *Home Sav. of Am., FSB v. United States,* 57 Fed.Cl. 694, 728–29 (2003); *Westfed Holdings,* 55 Fed.Cl. at 562. Long Island bears the burden of proving these damages, but the government bears the burden of proving that Long Island's efforts at substitute performance were unreasonable. *See, e.g., Westfed Holdings,* 55 Fed.Cl. at 562 (breaching party bears the burden to show that reasonable mitigation opportunities existed and were ignored by non-breaching party). "Reasonableness, in turn, 'is to be determined from all the facts and circumstances of each case . . . [;] the person whose wrong forced the choice can not complain that one rather than the other was chosen.'" *Home Sav.,* 57 Fed.Cl. at 729 (quoting *In re Kellett Aircraft Corp.,* 186 F.2d 197, 198 (3d Cir.1950)).

In this case, it is evident that Long Island's mitigation through substitute performance reduced the amount of damages for which the government is liable—but not to zero.

### 2. Causation.

Causation is an essential element of Long Island's case for damages. *See Energy Capital Corp. v. United States,* 302 F.3d 1314, 1325 (Fed.Cir.2002). Long Island bears the burden of proof regarding that element. The government has questioned whether Long Island has proffered evidence of causation

sufficient that a reasonable fact-finder could resolve this element in Long Island's favor. *See Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987); *Anchor Sav. Bank, FSB v. United States,* 59 Fed.Cl. 126, 147 (2003). Long Island need not supply evidence demonstrating that the government's FIRREA-induced breach was the sole cause of Long Island's damages. *See Westfed Holdings,* 55 Fed.Cl. at 553. Rather, Long Island must put forward evidence tending to prove that the breach was a substantial factor in causing its damages. *See id.*

In resisting Long Island's claims for expectancy damages, the government argues that Long Island's decisions to sell assets and branches and to recapitalize through a conversion had a different, independent cause from the breach engendered by FIRREA. Def.'s Reply at 2. This causation objection to Long Island's claims turns on the contention that Long Island's restructuring plan was driven by a desire to convert to a stock company and not by a need to shrink to comply with FIRREA's capital requirements. Def.'s Reply at 3–11. The government avers that the capital plan approved by OTS allowed Syosset and Centereach to bring themselves into capital compliance on a consolidated basis by September 1992, before the sale of assets and branches. *Id.* at 8–9.[17]

This objection is contravened by evidence in the record regarding both the capital plan approved by OTS and the restructuring plan prepared by Bear Stearns. As noted previously, OTS delayed its approval of a capital plan for Centereach because OTS sought to require Syosset and Centereach to consolidate as a condition for approval. *See supra,* at 85. The banks would not accede to consolidation because it would have put the combined entity in a negative capital position. *See supra,* at 85 & n. 10. Thus, the govern-

---

**17.** On a consolidated basis, an expert for the government, W. Barefoot Bankhead, calculated that by September 1992, Syosset and Centereach had attained a core capital level of 3.68%, a tangible capital level of 2.68%, and a risk-based capital level of 7.02%. Def.'s App., Ex. 18 at Ex. J (corrected) (Long Island Consolidated Capital Position, Sept. 30, 1992–June 30, 1993). However, the risk-based capital requirement in effect at

that date was 7.20%, and thus Syosset and Centereach on a consolidated basis did not then satisfy applicable FIRREA requirements. *Id.,* Ex. 18 at Ex. B.

Mr. Bankhead has provided expert testimony on similar topics on behalf of the government in other *Winstar* cases in this Court, including *Westfed Holdings. See Westfed Holdings,* 55 Fed.Cl. at 558 & n. 22.

ment's focus on a consolidated entity ignores the negotiated result that maintained Syosset and Centereach as separate entities for capital-reporting and capital-plan purposes. In September 1992, Syosset and Centereach were distinct entities, and they did not consolidate until September 1993, after most of the restructuring plan had been carried out.

In addition, Syosset and Centereach retained Bear Stearns explicitly to provide "financial advisory and investment banking services for recapitalization and restructuring purposes." Def.'s App., Ex. 81 at PLI094 0321 (Minutes of Syosset Board of Trustees Meeting (Sept. 22, 1992)). Thereafter, Bear Stearns's "restructuring alternatives" focused on achieving compliance with FIRREA's capital requirements. *Id.*, Ex. 15 at PLI094 1759 (Presentation on Restructuring Alternatives, Board of Trustees Meeting (Nov. 19, 1992)); *id.*, Ex. 86 at PLI094 1074–75 (Minutes of Board of Trustees Meeting (Nov. 19, 1992)). The restructuring plan included merging Centereach and Syosset and writing off goodwill, *after* selling $1.0 billion of branches and deposits and selling $1.25 billion of securities and loans. *Id.*, Ex. 15 at PLI094 1759. Indeed, upon submission by the banks of the restructuring plan to OTS on November 23, 1992, OTS a month later indicated it did not object to the plan and, instead, considered it an acceleration of the approved capital plan. *Id.*, Ex. 87 (Letter from Angelo A. Vigna, Regional Director, OTS, to the Boards of Syosset and Centereach (Dec. 23, 1992)). Moreover, even after most of the restructuring plan had been accomplished, OTS and FDIC were still concerned because Long Island had sold "high earning and good assets" and had retained non-performing assets that caused the Bank to have a less-than-desirable risk profile. *See supra*, at 86. Finally, the Bank did not attain an appreciable "capital cushion" over FIRREA's requirements until after it had converted and acquired an injection of capital through the IPO. Def.'s App., Ex. 92 at

PLI150 0222 (Long Island Bancorp, Inc.'s 1994 Annual Report). *See also* Baxter Decl. II ¶ 7.

As Judge Bruggink's decision in *Home Savings of America* indicates, a failure to provide a capital cushion would have left the Bank in a precarious operating position and susceptible to adverse action by the regulating agencies if risks were realized in the future. *Home Sav.*, 57 Fed.Cl. at 697–98. In short, the government's arguments on causation are not strong. *See Anchor Sav.*, 59 Fed.Cl. at 147–48 (rejecting a comparable causation argument by the government). And, because causation is a question of fact that ordinarily should be determined at trial, *Globe Sav.*, 59 Fed.Cl. at 98 (citing *Anchor Sav.*, 59 Fed.Cl. at 147; *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1356 (Fed.Cir.2001)), the government's contentions regarding causation do not provide grounds for entry of partial summary judgment in its favor on expectancy damages.

### 3. Lost profits.

"Profits on the use of the subject of the contract itself, here supervisory goodwill as regulatory capital, are recoverable as damages" where the damage proximately resulted from the breach, was foreseeable, and can be proved with reasonable certainty. *California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1349 (Fed.Cir.2001) ("*Cal Fed*"). *See also Energy Capital*, 302 F.3d at 1325. Importantly, the Federal Circuit has cautioned that "[b]oth the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute." *Cal Fed.*, 245 F.3d at 1350.

In support of its claim for lost profits, Long Island's expert, Dr. Nevins D. Baxter,[18] submitted a declaration containing five damage components: (a) net earnings lost from 1993 through 1998 [19] due to $1.06 billion of

---

18. Dr. Baxter has employed a similar methodology in expert reports and testimony in other *Winstar* cases in this Court, including *LaSalle Talman, Glendale*, and *Anchor Savings*. *See Anchor Sav.*, 59 Fed.Cl. at 133.

19. Dr. Baxter explains that he was instructed by Long Island's counsel to use 1998 as the end point because, following the merger into Astoria in that year, separate financial data for the two institutions do not exist. Baxter Decl. ¶ 7. Regardless of whether such data exist, transactions including and after the Astoria acquisition argu-

shrinkage; (b) net earnings lost thereafter measured by reduced IPO proceeds; (c) "wounded bank" damages incurred from 1990 to 1993 incident to the breach; (d) the cost of replacing the deposit franchise as of September 1998; and (e) the amount of savings that could have been realized had the banks been able to use the net earnings from the first four components to pay off interest-bearing liabilities. Baxter Decl. ¶¶ 5, 8.

### (a.) *Foregone assets from shrinkage.*

 Dr. Baxter calculated Long Island's lost profits for the years 1993 through 1998 to be $90.9 million based upon the bank's shrinkage by $1.06 billion. His calculation is based on the banks' actual pre-tax return on average assets and the assumption that the banks would have maintained the same ratio of average borrowings to average deposits as they had actually employed. Baxter Decl. ¶¶ 10–16. The government responds with three arguments to counter Long Island's shrinkage claim: (1) there is no evidence that the banks attempted to keep wholesale funding proportional to retail deposits, Def.'s Mot. at 43–46; (2) the claimed lost profits are based on the return on the average assets rather than the return on specific types of assets that were sold or would have been acquired, *id.* at 51–54; and (3) Long Island failed to attempt to mitigate by replacing the assets despite having the ability to do so. *Id.* at 46–51, 55. These three objections by the government might be found to have merit after trial to reduce or diminish Long Island's lost-profits claim, but they do not defeat it as a matter of law.

First, the government's contention regarding the relationship, or lack thereof, between wholesale funding and retail deposits takes issue only with a particular element of Dr. Baxter's methodology, not with the appropriateness of a lost-profits calculation. *See Globe Sav.,* 59 Fed.Cl. at 95. The government's point merely demonstrates that the details of a lost-profits computation for Long Island must be addressed at trial. *Id.* The evidence in the existing record shows that Long Island and its predecessor entities went through three phases respecting wholesale borrowings. During the first period, from 1983 to 1990, the proportion of such borrowings to retail deposits ranged from 16.2% to 10.1%, with the lower percentages coming in the years immediately before the enactment of FIRREA. Def.'s App., Ex. 109 at Ex. B–1 (Long Island Wholesale vs. Retail Funding Sources 1983–1988). During the capital-plan period, from 1991 to 1994, the banks reduced their wholesale borrowings significantly, to only 7.4% to 4.1% of retail deposits. *Id.* The reduction was consistent with the overall strategy of shrinking assets. Finally, during the post-capital-plan period, from 1995 to 1998, wholesale borrowings again rose as a percentage of retail deposits to 15.8% to 49.2%. *Id.* These undisputed facts tend to negate the government's contention regarding wholesale borrowings, but they do not do so conclusively.

Second, the government's assertion that Long Island failed to "point to actual profitable opportunities that it has foregone," Def.'s Reply at 13, also involves a genuine dispute of material fact. The government itself refers to "Dr. Baxter['s] acknowledg[ment] that [Long Island] had opportunities if it chose to pursue them." Def.'s Mot. at 48 (citing Def.'s App., Ex. 80 at 216:20–24 (Baxter dep. (Feb. 10, 2000) ("these opportunities [that the bank had found in the actual world to grow assets] weren't unique or limited in size–there's a very, very large market out there relative to Long Island Savings Bank")). This component of Dr. Baxter's lost-profits model is not speculative as a matter of law. *See Globe Sav.,* 59 Fed.Cl. at 94 (contrasting the bank's expert's testimony with that in *Southern National Corp. v. United States,* 57 Fed.Cl. 294 (2003), and *Fifth Third Bank of Western Ohio v. United States,* 55 Fed.Cl. 223 (2003)). Additionally, the banks' actual operations both prior to the breach and during the capital-plan period provide a level of certainty reasonable enough to withstand summary judgment. *See Globe Sav.,* 59 Fed.Cl. at 94 n. 10. Notably, both representatives of OTS and FDIC observed late in 1993 that the assets sold by

ably are too remote from the breach to be considered part of the banks' mitigation, either for

better or worse. *See LaSalle Talman,* 317 F.3d at 1373–74.

the banks up to that point as part of the shrinkage were "high earning and good assets." Def.'s App., Ex. 85 at PLI080 1161 (Minutes of Bank's Board Meeting (Oct. 26, 1993) (quoted more fully *supra*, at 86)).

Third, the government is mistaken that the banks are barred from recovery merely because after 1994 they "*could have* leveraged their existing excess capital or down-streamed an additional $134.3 million of capital from the holding company into the thrift for investment purposes." Def.'s Mot. at 48 (emphasis added). In April 1994, Long Island had completed a recapitalization through a conversion to a stock company and an initial public offering. *See supra*, at 87. Manifestly, this contention by the government bears on the post–1994 period addressed by Dr. Baxter in his lost-profits calculations and not the earlier years. The government's position thus might affect the amount of lost profits that are recoverable, but it does not constitute a full defense against an award of such profits. It bears emphasis that the burden is on the government to show that the banks' actual efforts at mitigation were unreasonable. *See supra*, at 90.

Finally, the Federal Circuit has asseverated that " '[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.' " *LaSalle Talman*, 317 F.3d at 1374 (quoting *Locke v. United States*, 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960)); *accord Bluebonnet Sav.*, 266 F.3d at 1356–57; *Cal Fed.*, 245 F.3d at 1350; *Williston* § 64:9 at 93.

*(b.) Reduced IPO proceeds.*

■ The second element of Dr. Baxter's lost-profits calculation values the post–1998 profits by postulating that the proceeds from the 1994 IPO would have been $97.2 million higher but for the breach because the banks would have been bigger and more profitable. Baxter Decl. ¶¶ 17–18. Dr. Baxter relied on the calculation of Ronald Riggins, the banks' expert who conducted the valuation of the

IPO proceeds but for the breach. Riggins Decl. ¶ 9. Mr. Riggins determined that the additional gross proceeds would have been $99.2 million higher, which amount Dr. Baxter discounted by a two percent marketing-fee expense. Baxter Decl. ¶ 18.

In opposition, the government puts forward a pair of causation arguments aimed at the conversion that served as Dr. Baxter's valuation baseline. It contends that the banks' decision to convert was an "independent and collateral undertaking[ ]" that was too remote from the breach. Def.'s Mot. at 61 (quoting *Energy Capital*, 302 F.3d at 1328). It also argues that Long Island was not *economically* injured, because it had no need for the capital and would have used the additional proceeds toward the stock repurchase and dividends it did actually pay between 1994 and 1998. Def.'s Mot. at 59–60; Def.'s Reply at 12.

Putting aside the substantial question of whether post–1998 lost profits can be established with reasonable certainty and are not too speculative, *see Globe Sav.*, 59 Fed.Cl. at 95–96, the government's causation arguments are unavailing. First, just as it was foreseeable that the banks would have to shrink, it was likewise foreseeable that the conversion of a smaller bank would raise a smaller amount of capital. Pls.' Opp'n at 34 (citing *Home Sav.*, 57 Fed.Cl. at 726). Whether the conversion and attendant raising of capital were the immediate consequence of the breach is an issue of causation, which issue is not ordinarily a proper subject for summary disposition. *Globe Sav.*, 59 Fed.Cl. at 98. Respecting the government's economic argument, Long Island is correct that the use to which it put some of its actual IPO proceeds is irrelevant to the issue of whether it is entitled to recover lost profits in the form of foregone proceeds.

*(c.) Incidental losses ("wounded bank damages").*[20]

■ Dr. Baxter calculated that the actual, out-of-pocket costs directly related to the

---

**20.** In other *Winstar* cases, so-called wounded bank damages have been treated as a species of reliance damages. *See, e.g., Anchor Sav.*, 59 Fed. Cl. at 138. They may alternatively be deemed "incidental loss" that is an adjunct to an expectancy award. See *Globe Sav.*, 59 Fed.Cl. at 92 n. 9 (discussing an "incidental loss" included in

breach totaled $8.1 million. Baxter Decl. ¶ 20. These costs include higher deposit insurance premiums paid by Centereach to FDIC, excess OTS assessment fees, costs related to developing the capital plan, and transaction costs related to the sales of assets and branches. *Id.* ¶ 19.

The government concedes liability for the capital plan costs incurred prior to September 1992. Def.'s Mot. at 93. For incidental losses incurred at later times, the government defends on two grounds—the causation argument addressed and rejected *supra,* at 90–91, and a claim that increased deposit insurance costs and assessments are speculative. *Id.* at 93–94. However, like causation, the government's contention regarding speculativeness is an issue ordinarily reserved for trial. *See Anchor Sav.,* 59 Fed.Cl. at 164 (denying summary judgment on identical issue). Summary judgment is not appropriate.

### (d.) Cost to replace the deposit franchise.

■ The fourth component of Dr. Baxter's analysis is a calculation of the amount it would have cost to replace the $1.06 billion of foregone deposits as of September 1998, subtracting the $13 million premium the banks received for the 1993 sale of branches and deposits. Baxter Decl. ¶ 22. Dr. Baxter developed this hypothetical replacement-cost model as a proxy for calculating the damages following the Astoria merger in 1998. *Id.* The calculation is based not on the value of the actual deposits sold, but on the value of other branch sales in the New England and Mid–Atlantic states from September 1997 through September 1999 and whole bank premiums in the same period. *Id.* ¶¶ 23–25. He computes the net cost at $114.1 million. *Id.* ¶ 26.

On the facts of this case, Dr. Baxter's model is both purely hypothetical and seemingly duplicative of the reduced-conversion-proceeds methodology he employed as the second component of his lost-profits analysis. Both defects constitute fatal flaws. *See La-Salle Talman,* 317 F.3d at 1375 (rejecting a model calculation for damages that does not reflect the "actual experience" of the institu-

tion), and 1371 ("[t]he non-breaching party is not entitled, through an award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred") (citing 3 E. Allen Farnsworth, *Farnsworth on Contracts,* 193 (2d ed.1998)); *Restatement Contracts,* Ch. 16, Topic 2 introductory note, at 109 ("the injured party is entitled to full compensation for his actual loss"), and § 347, cmt. e ("[t]he injured party is limited to damages based on his actual loss caused by the breach"). The government is entitled to summary judgment on the fourth component of Dr. Baxter's calculation.

### (e.) Liability-replacement damages.

■ The final component of the banks' claim for lost profits is Dr. Baxter's determination that the banks would have saved $21.5 million had they been able to use the lost profits represented by the first four components of his model to reduce interest-bearing liabilities. Baxter Decl. ¶¶ 27–29. The government correctly observes that this calculation in effect seeks prejudgment interest, which is barred as a matter of law. *See Commercial Fed. Bank,* 59 Fed.Cl. at 356 (citing *Library of Congress v. Shaw,* 478 U.S. 310, 319, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986)). The Court therefore grants the government summary judgment on plaintiffs' lost-profits claim for liability-replacement damages.

### 4. Cost of replacement capital.

■ As an alternative measure for expectancy damages, the banks proffer a cost-of-replacement-capital theory. The banks' approach has two aspects, the first being the net cost that would have been incurred in replacing the goodwill that existed on Centereach's books on the date of the breach, and the second being the cost of the actual injections of capital into the banks through the capital infusion following the conversion and the IPO.

The banks retained Professor Charles W. Calomiris to prepare an expert report calculating the net cost of replacing the remaining

expectancy damages under *Restatement Contracts* § 347(b)).

goodwill with tangible capital as of the date of the breach.[21] His report presents two methods for measuring this category of damages. First, his "cash equivalent" model hypothesizes that in September 1989 the government could have given the banks $288.6 million in cash to replace the $492 million of unamortized goodwill. Calomiris Decl. ¶¶ 17–28. Second, his "preferred stock" model supposes that Centereach could have issued preferred stock to replace the goodwill at the time of the breach. *Id.* ¶¶ 29–35. Professor Calomiris measures the resulting damages using this model at $288.8 million. *Id.* ¶ 32.

It is undisputed that both of Professor Calomiris's models are entirely hypothetical in the sense that the government did not contribute cash to the banks at the time of the breach nor did Centereach ever issue preferred stock. Centereach did not actually attempt to recapitalize in December 1989. Instead, its capital plan approved by OTS for purposes of FIRREA was put in place in 1991, and that capital plan was implemented primarily in 1993 and 1994.

As to Professor Calomiris's methods themselves, Professor Calomiris admits that "many of the assumptions in the two models are the same," the only differences being that the transaction costs in each model produce different amounts, and "the models are measuring two very different things." *Id.* ¶ 37. Finally, the banks' motion for summary judgment refers only to the "cash equivalent" model and states that except for having applied a forty percent tax rate to his calculation, "Professor Calomiris has used the same model as the one used by the plaintiff's expert in *Glass* [*v. United States*, 47 Fed.Cl. 316 (2000), *rev'd on other grounds*, 258 F.3d 1349 (Fed.Cir.2001)]." Pls.' Mot. at 20.

As numerous judges of this Court have opined, " 'plaintiff's damages should be calculated on the basis of the actual means by which it filled its capital deficit.' " *Commercial Fed. Bank*, 59 Fed.Cl. at 358 (quoting *LaSalle Talman v. United States*, 45 Fed.Cl. 64, 103 (1999), *aff'd in part, vacated in part on other grounds*, 317 F.3d 1363, 1375 (Fed. Cir.2003)). In more than a few cases, the Court has rejected the *Glass* model and similar hypothetical models where the institution mitigated by means other than raising capital. *Globe Sav.*, 59 Fed.Cl. at 96–97 (collecting cases).[22] These precedents notwithstanding, "[t]he Federal Circuit in *LaSalle Talman* held that 'the cost of replacement capital can serve as a valid theory for measuring expectancy damages in the *Winstar* context,' where a plaintiff's actual experience raising capital could be used to determine cost of capital." *Id.* at 97. *See also Home Sav.*, 57 Fed.Cl. at 708, 728 (recognizing legal viability of a claim for cost of replacement capital following *LaSalle Talman* and finding that plaintiffs satisfied their burden of proof at trial where such claim was based on an actual, not hypothetical, stock offering). In *LaSalle Talman*, however, the Court of Appeals cautioned that "in determining damages the benefits of that capital must be credited, as mitigation due to the replacement of goodwill with cash." *LaSalle Talman*, 317 F.3d at 1375.

In contrast to cases like *Commercial Federal*, 59 Fed.Cl. at 358, and *Globe Savings*, 59 Fed.Cl. at 96, in which the thrifts mitigated solely by way of shrinking, in the instant case Long Island's means of substitute performance included both shrinking and recapitalization. Respecting recapitalization through the 1994 conversion and IPO, $164 million of the IPO proceeds was actually infused in

---

**21.** Because the banks' financial statements were prepared as of September 30, 1989, Professor Calomiris used this date as the date of the breach, rather than August 9, 1989, the date FIRREA was enacted, or December 7, 1989, the date the FIRREA-implementing regulations became effective. Calomiris Decl. ¶ 7.

**22.** The banks' argument that the government is judicially estopped from attacking Professor Calomiris's report, Pls.' Mot. at 22–25, is without merit. Although an expert witness retained by

the government in connection with *Glendale Federal Bank, FSB v. United States*, 39 Fed.Cl. 422, 425 (1997), had prepared a declaration approving of a similar model, the expert witness and his report had been withdrawn before trial. That witness thus provided no evidence that was used by the Court in *Glendale*. In the circumstances, no estoppel arises. *See New Hampshire v. Maine*, 532 U.S. 742, 750–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).

Long Island. *See supra,* at 87. This actual means taken by Long Island to mitigate the loss of its goodwill must be taken into account in the calculus of damages.

Aside from raising arguments focusing on the counterfactual and hypothetical nature of Professor Calomiris's specific models, the government contests damages based on the banks' actual recapitalization by returning to its mitigation and causation refrain, asserting that Syosset and Centereach would have merged in 1993 regardless of the breach and that the banks achieved capital compliance "by seeking, and obtaining, a five-year exemption from FIRREA's new capital requirements." Def.'s Mot. at 74, 76. As previously noted, however, the banks did not achieve a capital cushion until *after* the April 1994 conversion. *See supra,* at 87. Whether the $164 million infused into the Bank in 1994 represents the actual amount necessary to mitigate the loss of goodwill as regulatory capital and maintain a capital cushion at an adequate level remains a controverted issue, but there can be no dispute that such effort represents actual substitute performance.

The Court therefore denies both parties summary judgment respecting a damages calculation based on the actual replacement of goodwill as regulatory capital with $164 million (or a lesser "reasonable" amount) of cash capital in 1994.

### D. *Restitution*

■ As an optional measure of damages to expectancy theories, the banks put forward a restitution claim. In support of the banks' claim, Professor Christopher M. James submitted an expert report calculating that the net benefit the banks conferred on the government amounted to a total of approximately $474 million. James Decl. ¶¶ 23–24.[23] Professor James and the banks emphasize that his analysis is based on the government's own estimates in April 1983 following the December 1982 bidders' conference of both the cost to liquidate Suffolk Phoenix and the cost to the government to continue operating it for ten years. *Id.* ¶ 9; Pls.' Mot. at 28. In the report presently before the Court, Professor James relies only on the latter estimate for his calculation of two different benefits conferred on the government.[24] First, he calculates the net benefit conferred on the government by avoiding direct responsibility for operating Suffolk Phoenix through selling it to Syosset. Professor James values this benefit as approximately $316 million. *Id.* ¶ 22–23. Second, Professor James computes that the government would have realized an additional investment income of approximately $258 million based on investing the funds it was able to retain. *Id.* ¶ 24.

Long Island's claim for restitution based on the government's cost of continued operation fails for the same fundamental reason claims based on liquidation cost and net liabilities assumed have failed. *See LaSalle Talman,* 317 F.3d at 1376 ("Although the assumed [goodwill] liabilities are indeed an accounting cost, ... they are not a usable measure of either cost to the thrift or benefit to the government, and thus not an appropriate threshold for restitution damages."); *see also Westfed Holdings,* 55 Fed.Cl. at 561. As the Federal Circuit has explained, where a claim for restitution is "measured in terms of a liability that never came to pass, and based on a speculative assessment of what might have been," such a claim is "both speculative and indeterminate" and therefore must be rejected as a matter of law. *Glendale,* 239 F.3d at 1382.

The government is entitled to summary judgment on Long Island's claim for restitution damages.

### CONCLUSION

For the reasons stated, the government's motion for summary judgment on damages is granted insofar as it concerns (1) those elements of Long Island's lost-profits claims that are based upon cost to replace the de-

---

23. Professor James provided expert testimony in a similar vein on behalf of the plaintiff in *LaSalle Talman. See LaSalle Talman,* 317 F.3d at 1376.

24. Professor James's original report dated October 29, 1999 used the liquidation-cost estimate.

However, apparently realizing the questionable validity of this basis following the Federal Circuit's decision in *Glendale,* Long Island's counsel asked him to develop an alternative approach. James Decl. ¶¶ 5–6, 11.

posit franchise that Long Island sold and upon liability-replacement damages, and (2) Long Island's claims based upon a restitution theory. The government's motion is otherwise denied. Long Island's motion for summary judgment on damages is denied.

A trial on liability and damages will be held in this case. In accordance with RCFC Appendix A, ¶ 12, the parties are directed to file a joint status report on or before March 30, 2004, addressing the items in ¶ 12 (last sentence) with respect to trial.

It is so ORDERED.