**FRANKLIN FEDERAL SAVINGS BANK, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 92–739C.

United States Court of Federal Claims.

April 22, 2004.[1]

---

1. The original version of this opinion was issued on April 1, 2004. The court afforded the parties ten days to determine to whom and in what amounts final judgment should be entered. Accordingly, the opinion is reissued solely with the amounts each plaintiff shall receive.

Thomas M. Buchanan, Washington, DC, for plaintiffs. Eric W. Bloom and Charles B. Klein, of Washington, DC, and Thomas R. Dyer, of Memphis, TN, of counsel.

Glenn I Chernigoff, U.S. Department of Justice, Washington, DC, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, and Director David M. Cohen, for defendant. Colleen Conry, Gregory Firehock, John J. Hoffman, John H. Roberson, and Delisa M. Sanchez, of counsel.

## OPINION

FIRESTONE, Judge.

On September 5, 2002, the court issued a liability opinion in this *Winstar*-related case, holding that the United States ("defendant"), through the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, P.L. No. 101–73, 103 Stat. 183 ("FIRREA"), breached an express contract with the plaintiffs—including Franklin Federal [2], the holding company ("Franklin Financial"), and the holding company's seven original shareholders [3] ("Seven Shareholders")—to treat the $9.4 million of supervisory goodwill of Franklin Federal as a regulatory capital asset amortizable over twenty-five years. The court granted summary judgment for the plaintiffs on the issue of liability. *See Franklin Fed. Sav. Bank v. United States,* 53 Fed.Cl. 690 (2002) ("*Franklin I*").

On January 7, 2003, the court issued an initial opinion on damages in which it granted in part and denied in part the parties' respective motions for summary judgment. The court held that the plaintiffs, Franklin Federal and Franklin Financial, were entitled to damages in the amount of $109,016.83 and $205,841.79, respectively, for various expenditures to professional firms (law, accounting, etc.), as well as the Office of Thrift Supervision ("OTS"), that were necessitated by FIRREA. The foregoing amounts included payments for Capital Plan preparations

---

**2.** Franklin Federal Savings Bank is a Tennessee bank created in January 1989 by the supervisory conversion of Morristown Savings and Loan Association ("Morristown") and its acquisition by Franklin Financial Group, Inc., a bank holding company.

**3.** The seven original shareholders are: George O. Haggard, Jr.; Ben B. Jarnigan; Richard C. Jesse; A. Eugene Jolley; George R. McGuffin; Charles G. Robinette; and Jean S. Keener.

and regulatory advice in the wake of FIR-REA, as well as professional and official fees (i.e., transactional costs) incurred in raising new capital to replace supervisory goodwill disallowed by FIRREA. The court granted summary judgment for defendant on various claims, including, the $9.4 million restitution claim of Franklin Financial based on ·the excess liabilities it assumed in the superviso-ry conversion; the restitution (or reliance) claim of Franklin Financial for the $5 million infused into Franklin Federal at the time of the supervisory conversion; part of Franklin Financial's $225,787.77 post-breach damages claim based on litigation expenses incurred in a district court action against the United States; and the claim of Franklin Federal— in the alternative amounts of $21.2 million, $14.4 million or $12.7 million (the bank), or $10.6 million (the shareholders)—for the hypothetical cost of replacing, or partially replacing, the bank's supervisory goodwill with real capital. *See Franklin Fed. Sav. Bank v. United States,* 55 Fed.Cl. 108 (2003) (*"Franklin II"*).[4]

In the foregoing damages opinion the court found that there were disputed issues of material fact which precluded summary judg-ment for either side with respect to the following claims: (1) the pre-breach reliance damages claim of Franklin Financial based on the excess liabilities it assumed in the supervisory conversion; (2) the balance of the transactional costs claimed by Franklin Financial—in the range of $145,000 to $150,-000—as post-breach transaction costs from raising new capital for the ·bank in 1993; (3) the claim of Franklin Federal for damages based on the increased cost of funds due to FIRREA; (4) the claim of the Seven Share-holders for the dilution of their original equi-ty ownership interests in Franklin Financial (and, indirectly, Franklin Federal) resulting from the FIRREA-induced infusion of re-placement capital; and (5) the claim of share-holder Charles G. Robinette for stock options unexercised because of FIRREA. The plain-tiffs also had a lost profits claim which, be-

fore trial began, they elected not to pursue. Accordingly, this decision addresses the five damage theories identified above.

Trial was held on the above five claims in September 2003. The court heard testimony from twenty witnesses over a four-week peri-od. Based on the testimony at trial and all of the documentation of record, the court rules as follows with respect to the claims at issue: (1) the plaintiffs are not entitled to damages on their reliance claim; (2) the plaintiffs are entitled to $11,789 in additional transactional costs expended to raise new capital; (3) the plaintiffs are not entitled to cost of deposits damages; (4) the Seven Shareholders are entitled to $470,060 for the payment of dividends but are not entitled to damages for the dilution of equity ownership; and (5) Mr. Robinette is not entitled to dam-ages based on loss of his stock options.

## DISCUSSION

### I. Reliance Damages Based on Assump-tion of Certain Excess Liabilities

 Franklin Financial seeks $4.2 million in reliance damages based on the assumption of certain excess liabilities that it assumed when Morristown was converted. Franklin Financial charges that at the time of the conversion, Franklin Financial, through Franklin Federal, assumed Morristown's $9.4 million negative net worth in return for the promise by the regulators that Franklin Fed-eral could treat this negative net worth as an amortizable asset that could be leveraged to increase profits. Franklin Financial argues that after Franklin Federal lost supervisory goodwill as an asset that could be leveraged, it nonetheless continued to pay off the liabili-ties it acquired. Thus, Franklin Financial argues, Franklin Federal paid off deposits without the benefit of any earnings attribut-able to assets acquired through leveraging supervisory goodwill. Accordingly, Franklin Federal contends it incurred real costs. Franklin Financial seeks only $4.2 million in reliance damages, instead of the full amount

---

4. The foregoing determinations in the court's lia-bility and damages opinions of September 2002 and January 2003, respectively, are the law of the case. "Under law of the case,..., a court will generally refuse to reopen or reconsider

what has already been decided at an earlier stage of the litigation." *Suel v. Secretary of HHS,* 192 F.3d 981, 985 (Fed.Cir.1999) (citing *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.,* 761 F.2d 649, 657 (Fed.Cir.1985)).

of lost supervisory goodwill, on the ground that certain components of supervisory goodwill were not tied to potentially appreciable assets, such as loans. Franklin Financial claims that it has focused on the portion of supervisory goodwill that did not have any asset value.

In *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374 (Fed.Cir.2001), the Federal Circuit indicated that reliance damages based on the assumption of excess liabilities in a *Winstar*-related context were only recoverable if, and to the extent that, the plaintiff(s) could prove that "actual losses" were incurred. "The underlying principle in reliance damages," the Federal Circuit explained, "is that a party who relies on another party's promise made binding through contract is entitled to damages for any *losses actually sustained* as a result of the breach of that promise." *Id.* at 1382 (emphasis added).

This court ruled in *Franklin II*, "[i]n order to recover reliance damages, ... the Franklin Plaintiffs must establish that their assumption of Morristown's excess liabilities under the goodwill contract led to concrete, measurable losses when the enactment of FIRREA breached the contract." 55 Fed.Cl. at 120. In other words, the plaintiffs must show what actual expenditures they incurred because they were forced by FIRREA to reduce the excess liabilities of the converted bank, Franklin Federal, more quickly than they would have in the absence of the breach. To prevail at trial, the court stated that Franklin Financial "must demonstrate when, to whom, and in what amounts those expenditures were made, and that FIRREA was the proximate cause of those expenditures." *Id.* at 121. Moreover, those expenditures must be distinct from any other damages claimed in this action.

It is not disputed that Franklin Financial did not present any evidence at trial to show that it made any specific payments to pay off any amount of the $4.2 million in assumed liabilities. It, therefore, did not present evidence to show "when, to whom, and in what

amounts those expenditures were made." *Id.* Rather, Franklin Financial asks the court to consider the fact that included among the items Franklin Federal could count toward goodwill were "deferred loan losses" and "deferred conversion costs," which carried no corresponding assets. In such circumstances, Franklin Financial argues, there was no way for Franklin Federal to ever recoup anything from these items when they lost the right to leverage supervisory goodwill. Thus, to the extent Franklin Federal paid depositors the amount equal to the amount of goodwill attributable to the "deferred loan losses and deferred conversion costs," or $4.2 million, it incurred a payment without a corresponding asset and, thus, incurred a "real cost."

Franklin Financial supported this theory with the testimony of its economic expert Dr. R. Dan Brumbaugh, who holds a Ph.D. in economics from George Washington University and is currently a Senior Finance Fellow at the Milken Institute.[5] Dr. Brumbaugh testified that of the $9.4 million in net liabilities Franklin Financial assumed through Franklin Federal, $4.2 million were matched to components of goodwill that had no potential "asset" value. More specifically, Dr. Brumbaugh explained that $4.2 million of net liabilities were matched to deferred loan losses of $3,989,523 and deferred conversion costs of $214,001. These components of goodwill, in contrast to certain loan assets that also made up goodwill, would never increase in value due to market forces. Accordingly, when Franklin Federal eventually paid off the $9.4 million in assumed liabilities between 1989 and 1996, $4.2 million did not have any corresponding appreciable asset and was, thus, a pure "cost." According to Dr. Brumbaugh, the $4.2 million in assumed liabilities was paid off either through retained earnings (which were not issued as dividends) or through the cash infusions (which were also provided by Franklin Financial). Either way, he opined, Franklin Financial was never able to recover the cost.

---

5. From 1982 to 1986, Dr. Brumbaugh was the Deputy Chief Economist at the Federal Home Loan Bank Board, which meant that he was the chief federal regulator for savings and loan institutions.

Thus, Franklin Financial paid the $4.2 million.

The government challenged Dr. Brumbaugh's analysis with the testimony of Dr. Sam Peltzman, who holds a Ph.D. in economics from the University of Chicago and is a professor at the University of Chicago Graduate School of Business and Director of the George J. Stigler Center for the Study of the Economy and the State. Dr. Peltzman explained that a bank cannot be dissected into particular liabilities matched against particular assets. Instead, it is an operating enterprise in which the entire bundle of assets is used to pay off the entire bundle of liabilities. According to Dr. Peltzman, if Franklin Federal is examined properly, there is no evidence that Franklin Financial suffered any out-of-pocket expenses by virtue of the fact that Franklin Federal lost the right to leverage certain components of goodwill. Rather, the record shows that Franklin Federal was able to pay off liabilities from the spread it made on the interest it received on its assets. According to Dr. Peltzman, when Franklin Financial contracted with the government, the government gave Franklin Financial more than just the right to leverage goodwill; it gave Franklin Financial the right to operate the business of Franklin Federal. Thus, he opined the court must look at the entire bank to determine if Franklin Federal was able to sustain itself or whether Franklin Financial was forced to pay off deposits for Franklin Federal. Dr. Peltzman cautioned that the court is missing the economic reality if it were to separate out any specific asset or liability and say that one specific asset served to pay off one specific liability.

Finally, Dr. Peltzman offered that the court could not ignore that Franklin Financial profited from its investment in Franklin Federal. He noted that Franklin Financial's $10.4 million infusion or investment (the original $500,000 plus the post-FIRREA $5.4 million infusions) into Franklin Federal led to $20.6 million payoff. This represented a significant "gain" not a "loss," according to Dr. Peltzman.

In response to Dr. Brumbaugh's testimony, the government also elicited testimony from Mr. Robinette, Franklin Federal's president and one of the Seven Shareholders. Mr. Robinette acknowledged that not all of Franklin Federal's success was attributable to Franklin Financial's post-breach infusions. For example, excluding all capital infusions, Franklin Federal's tangible capital increased by over $2.7 million by 1992, prior to the infusions.

The court agrees with the government that Dr. Brumbaugh's analysis is fundamentally flawed and, therefore, cannot support the plaintiffs' reliance damage claim. The court understands why Dr. Brumbaugh focused on $4.2 million. By focusing on supervisory goodwill without a corresponding asset, his theory endeavors to address some of the concerns identified by the Federal Circuit in *Glendale*. In particular, Dr. Brumbaugh tried to account for the Federal Circuit's finding that accounting losses are not sufficient to prove out-of-pocket damages, because assets can fluctuate in value. *See Glendale*, 239 F.3d at 1382–83. However, by eliminating the components of goodwill with corresponding assets, Dr. Brumbaugh did not establish out-of-pocket expenses. Dr. Brumbaugh's theory fails to account for the fact that individual bank assets are not matched to individual liabilities. Rather, to determine whether Franklin Financial had any out-of-pocket costs, the court must examine the performance of the bank as a whole. When the court examines the bank as a whole, it is clear that Franklin Federal was always able to pay off liabilities from the earnings on its banking operations and never had to look to Franklin Financial for a specific infusion to pay off a specific liability.

Franklin Financial's suggestion, that the court should ignore the earnings Franklin Federal made after the breach because they were generated by the post-breach infusions paid for by Franklin Financial and had nothing to do with the government's agreement, is not supported. The court agrees with Dr. Peltzman that, as part of the government's agreement with Franklin Financial, Franklin Financial acquired the right to operate the bank and to turn the bank into a profitable enterprise. Thus, the court should look to the bank as a whole to determine whether Franklin Financial suffered any reliance

damages. The court cannot ignore the bank's earnings achieved through the infusions. The fact that Franklin Financial may have enabled the bank to pay off the liabilities with earnings from assets acquired through those infusions, does not alter this result. Franklin Financial had the obligation under the law to mitigate damages. *See* Restatement (Second) of Contracts Sec. 350 (1981); *see also Robinson v. United States,* 305 F.3d 1330, 1336 (Fed.Cir.2002); *Westfed Holdings, Inc. v. United States,* 52 Fed.Cl. 135, 156 (2002); *Middleton v. United States,* 175 Ct.Cl. 786, 792, 1966 WL 8875 (1966). Franklin Financial therefore was obligated to infuse resources into the bank. By virtue of Franklin Financial's mitigation efforts, Franklin Federal was able to pay off all of its liabilities with the interest earned on its assets and to turn Franklin Federal into a very profitable bank. Franklin Financial did not sustain any out-of-pocket losses in connection with the $4.2 million in lost goodwill.[6]

The court made plain in its summary judgment decision on reliance damages that Franklin Financial could not seek reliance damages without proof of specific payments for specific liabilities. Franklin Financial has not sustained its burden of proof and, thus, has failed to demonstrate that it incurred reliance damages. Accordingly, Franklin Financial's reliance damage claim is denied. Franklin Financial did not suffer any reliance damages. To the contrary, Franklin Financial's $10.4 million investment yielded a handsome $20.6 million profit. The court cannot ignore those profits. *See La Salle Talman Bank, FSB v. United States,* 317 F.3d 1363, 1374 (Fed.Cir.2003) ("profits [that] are the direct result of actions taken in mitigation of the breach, . . . are properly credited [to the government]."). The Federal Circuit has clearly ruled, in *Glendale,* that reliance damages must be predicated on "losses actually sustained." 239 F.3d at 1382. Here, there were no out-of-pocket losses and, thus, no reliance damages.[7]

## II. Transactional Costs of Raising New Capital—1993

■ In *Franklin II,* the court found that $205,842 of transactional costs incurred by Franklin Financial in raising equity capital for Franklin Federal during 1993—through a private placement and a public offering— were compensable damages. 55 Fed.Cl. at 113. Franklin Financial claims additional costs of $149,201 that were not sufficiently documented to justify a favorable summary judgment ruling. The court stated that the plaintiffs would have the burden at trial to prove, "the existence of the additional transaction costs allegedly incurred in 1993, and that they were proximately caused by FIR-REA." *Id.* at 125.

At trial the plaintiffs relied on the testimony of Mr. Craine and Mr. Robinette to support their $149,201 damage claim. Essentially, both explained that the damages are based on the difference between the gross proceeds raised by the initial public offering ("IPO") and the private placement ($5,016,-385) and the net proceeds of the transactions ($4,661,342), resulting in the amount $355,043. From this amount, the court had already awarded $205,842 leaving then $149,201. Mr. Robinette testified that the offering proceeds were escrowed and used to pay only expenses related to the offering. Mr. Craine testified that the $205,842 previously awarded did not cover all of the transaction costs. He knew that there were additional printing costs, postage and courier costs, lease costs and other expenses that were included in the $149,201 and had specific evidence regarding approximately $37,000 but he had no specific recollection regarding how the remaining $112,127 was spent. Craine recalled that he had reconciled the escrow account at the time and, thus, he was

---

6. Indeed, to the extent that Franklin Financial mitigated its potential losses by infusing funds into Franklin Federal, it is claiming those costs under other theories, which are discussed below.

7. Having concluded that the plaintiffs did not sustain reliance damages, the court does not have occasion to address the government's contention that Dr. Brumbaugh failed to adequately account for the net operating loss carryforward tax benefits that the plaintiffs received in the supervisory agreement with the government. The government claims that Franklin Federal obtained $1.6 million in tax relief that was not accounted for by Dr. Brumbaugh.

assured that the expenses had been incurred and paid in connection with the private placement and public offering.

Although the plaintiffs had no evidence of specific costs regarding the $112,127, the plaintiffs presented specific evidence on $37,074. Mr. Craine testified that he could support $1000 with a canceled check for payment to the Tennessee Department of Commerce for registering the public offering. In addition, Mr. Craine testified that the $25,285 recorded in the cash receipts journal for Hiram H. Jones Associates ("Hiram Jones"), Franklin Financial's accounting firm, reflected fees incurred at the time of the transactions for services rendered in connection with those transactions. While Mr. Craine could not identify the nature of the services rendered or show that the fee was not paid to Franklin Federal, instead of Franklin Financial, he nonetheless maintained that the fee was unrelated to other services Hiram Jones could have performed for Franklin Federal. Mr. Craine also discussed a $7,862 record processing fee for services provided by Mellon Securities. He did not have any canceled checks but was confident that the payment was made. Finally, Mr. Craine testified to certain postal fees associated with the public offering. He estimated that Franklin Financial incurred $2,570 in stamps; $29 for a post office box; and $328 in Federal Express fees, in connection with the public offering. Again, Mr. Craine admitted that he did not have receipts for these items, but was certain the costs were incurred.

The court agrees with Franklin Financial that the lack of documentary evidence to support the plaintiffs' transaction cost claim is not necessarily fatal to their entire claim. *See Negron v. Caleb Brett U.S.A., Inc.,* 212 F.3d 666, 673 (1st Cir.2000) ("[W]e are aware of no rule of law that requires the plaintiff to prove her case by documentary rather than testimonial evidence."). However, after considering all of the testimony the court finds that Mr. Craine's explanation regarding the $112,127 is not sufficient to justify an award. As the government established during cross-examination, Mr. Craine's testimony regarding the amount of transaction costs is based on his assumption as to the number of shares sold. The government indicated that its records reflect a smaller number of shares sold than Mr. Craine's records. That difference in just a few shares could amount to thousands of dollars less in the escrow account in the first instance, than what Mr. Craine purports. The confusion regarding the precise amount of money that went into escrow, together with the absence of any explanation as for what the $112,127 paid, is enough for the court to deny the plaintiffs' claim for $112,127 in non-itemized transaction costs. Moreover, the court has little sympathy for Franklin Financial regarding this claim. Both the private placement and public offering occurred after this lawsuit was initiated. Franklin Financial had an obligation to keep the records associated with their damage claims. Having failed to do so, and without any evidence to show that costs were in fact incurred, let alone paid, the claim for $112,127 fails for lack of adequate proof.

With respect to the plaintiffs' itemized claim for $37,074, the court is persuaded that some of these costs were more likely than not incurred and paid in connection with the capital raising activities of Franklin Financial. Unfortunately for the plaintiffs, the court finds that the Hiram Jones fee for $25,285 is suspect, because Hiram Jones's records did not distinguish between work for Franklin Financial and Franklin Federal, and Hiram Jones did work for Franklin Federal that was entirely unrelated to the capital raising activities of the plaintiffs. Accordingly, the court has no way of determining whether the fees were paid for work Hiram Jones had performed for Franklin Financial and was associated with the public offering or the private placement.

The court finds that the remaining amount of $11,789 (which includes the fees for record processing, stamps, the mailbox, and Federal Express), however, is adequately supported by the testimony to support an award. The court finds that the testimony of Mr. Craine with regard to these expenses is sufficient to establish these costs. Thus, Franklin Financial is entitled to an additional $11,789 in transaction costs.

### III. Increased Cost of Funds due to FIR-REA

 Franklin Federal seeks to recover $1.073 million in so-called cost of funds or cost of deposit damages. Franklin Federal presented evidence at trial to show that following the breach, Franklin Federal lost depositors due to its insolvency and bad publicity. Franklin Federal then endeavored to show that, in order to staunch the deposit outflow, it had to increase the rates it paid to its depositors. Relying primarily on the testimony of Mr. Robinette, Mr. Jessee, and Dr. Brumbaugh, Franklin Federal asserted that, at various times following enactment of FIR-REA, Franklin Federal had to pay more than its competitors for deposits, which resulted in $1.073 million in cost of deposit damages.

More specifically, Mr. Robinette testified that he had a pricing strategy when he took over the bank in which he sought to increase the bank's profitability by paying less for deposits than his competitors. Mr. Robinette testified that his strategy was working until FIRREA was enacted and the bank fell out of capital compliance. Once the public learned of Franklin Federal's regulatory difficulties, through a series of articles in the local and national press, depositors left the institution. In order to keep depositors from leaving and to attract new depositors, Mr. Robinette stated that he was forced to offer higher interest rates than his competitors. Mr. Jesse echoed Mr. Robinette's testimony.

On cross-examination Mr. Robinette acknowledged that there was no contemporaneous evidence to support his claim. To the contrary, the government showed Mr. Robinette numerous statements he had made to his board of directors and bank regulators where he indicated that Franklin Federal was paying the same or lower interest rates than other local banks. Reading from the Agenda from the December 18, 1989 Board of Directors Meeting, Mr. Robinette testified, "This is the second month in a row we've had a very positive improvement in attracting lower cost deposits." In his President's Report for April 1991, Mr. Robinette wrote:

> The deposit loss doesn't appear to be connected with adverse publicity but appears to be more of a rate-driven situation. Our deposit pricing strategy continues to be slightly above the commercial banks (5 to 15 basis points) but below Home Federal, Jefferson Federal, and Security Trust (25 to 50 basis points).

In a January 28, 1992 letter to Mr. Doebereiner, Mr. Robinette wrote, "The Federal Home Loan Bank of Cincinnati Financial Institution Report for June 30, 1991, indicates our yield on earning assets was twenty-five basis points higher than peer group and our cost of funds was ten basis points below peer group." In his report for June 1992, President Robinette wrote:

> Our share of the market has gone from 12.13% to 8.09% from 1987 through 1991. Notice that Jefferson Federal's market share has increased .... [T]he most recent Central Bank TB–13 report showed our cost of funds 50 to 60 basis points under our peer group.... This deposit loss probably represents the "hot" money that has gone elsewhere for better rate [sic].

In his President's Report for August 1992, Mr. Robinette wrote, "We are still experiencing strong deposit inflows for the month of September and I have reduced rates paid on deposits on September 10th which will have another positive impact on the bottom line." Furthermore, Franklin Federal's deposit prices were thirty basis points better than the peer group as demonstrated in the November 1991 OTS Report of Examination. Finally, the August 1993 OTS Report of Examination shows that Franklin Federal's cost of deposits declined in 1991, 1992, and for the first seven months of 1993, and its deposit expense was below that of its peers from 1990 through 1992, and equal to its peers during 1993.

Despite the documentary evidence to the contrary, the plaintiffs' expert, Dr. Brumbaugh, supported Mr. Robinette's assessment with a statistical study. Dr. Brumbaugh presented a model purporting to measure Franklin Federal's increased cost of deposits. Dr. Brumbaugh compared the interest rates that Franklin Federal and its predecessor, Morristown, paid to depositors over a nine-year period (March 1985

through March 1994) with the interest rates paid by all other thrifts in Tennessee during the same period. FIRREA was implemented halfway through that time span, so the rate comparisons apply to nearly equal time segments pre-breach and post-breach. Dr. Brumbaugh explained that he chose all other thrifts in Tennessee as the peer group because that is the geographical area in which Franklin Federal and Morristown operated and those were the institutions against which they competed for depositors.

According to Dr. Brumbaugh, during the pre-breach period (March 1985 through December 1989), Morristown and, as of January 1989, Franklin Federal had an average cost of deposits of 7.499%, while their peers had an average cost of 7.487%. During the period prior to FIRREA, therefore, Morristown and Franklin Federal had a deposit funding disadvantage of 0.011% relative to other thrifts in Tennessee. During the post-breach period (January 1990 through March 1994) Franklin Federal's average cost of deposits was 5.694%, while the peer group had an average cost of 5.417%. After FIRREA, therefore, Franklin Federal had a deposit funding disadvantage of 0.277% relative to the other thrifts in Tennessee. Thus, according to the model, Franklin Federal's cost of deposits increased relative to its peers by 0.266% from the pre-FIRREA time period to the post-FIRREA time period. This difference, Dr. Brumbaugh asserts, was caused by FIRREA.

Dr. Brumbaugh testified that, but for FIRREA, Franklin Federal's cost of deposits disadvantage would have remained at the much smaller level of 0.011%. To measure Franklin Federal's damages, Dr. Brumbaugh calculated Franklin Federal's quarterly deposit expense, from January 1990 to March 1994, by multiplying its average net deposits by the "but for" cost of deposits (which is the pre-FIRREA 0.011% cost of deposits disadvantage Franklin Federal had relative to its peer group) then divided by four to arrive at the quarterly amount. The total from each quarter was then subtracted from Franklin Federal's actual deposit expense for each quarter. The cumulative difference for the thirteen quarters from January 1990 to

March 1994, amounts to $1.073 million and, according to Dr. Brumbaugh, represents Franklin Federal's increased cost of funds due to FIRREA. Dr. Brumbaugh concluded that Franklin Federal no longer faced a cost of funds disadvantage after March 1994.

In response to the plaintiffs' testimony, the government presented the testimony of several government examiners who had examined Franklin Federal during the period that was the subject of Dr. Brumbaugh's study. These witnesses, Messrs. Mullane, Poe, and Weakley, confirmed Mr. Robinette's contemporaneous statements and severely undermined Dr. Brumbaugh's study. For example, Mr. Mullane, an examiner for the OTS, testified that various examination reports prepared at that time covered by Dr. Brumbaugh indicated that Franklin Federal was doing better than its peers from an interest rate perspective. As of December 1990, "Franklin Federal's interest expense ratio was 20 basis points better than the peer group. In the next time period, 31 October '91, ... Franklin Federal was 30 basis points better that the peer group." Tr. at 2342:19–22 (citing Nov. 1991 OTS Report of Examination). Mr. Poe, the OTS examiner in charge, stated that he was unaware during the bank examination of cost of deposits problem, that "[i]f they had a significant disadvantage, I'm pretty sure I would have mentioned it somewhere in my examination report." Tr. at 2446:23–25. Finally, Mr. Weakley, an examiner for the Federal Deposit Insurance Corporation ("FDIC"), concurred that he saw no evidence that Franklin's cost of funds was damaged as a result of FIRREA.

In addition, the government presented the testimony of Dr. Peltzman, who identified the statistical flaws in Dr. Brumbaugh's analysis. In particular, Dr. Peltzman explained that Dr. Brumbaugh's analysis turned on the peer group he selected and the years he selected. Dr. Peltzman opined that if there were in fact a strong statistical correlation between the alleged harm caused by FIRREA and Franklin Federal's interest rates, it would withstand variation. Dr. Peltzman demonstrated that by varying any of Dr. Brumbaugh's assumptions, the results of Dr.

Brumbaugh's study failed to show any harm. In such circumstances, Dr. Peltzman concluded that Dr. Brumbaugh's study was unreliable.

It is well established that the trier of fact should accord greater weight to the plaintiffs' contemporaneous statements than to contradictory statements made at trial. *P.J. Dick, Inc. v. Principi,* 324 F.3d 1364, 1375 (Fed. Cir.2003); *Blinderman Const. Co., Inc. v. United States,* 695 F.2d 552, 558 (Fed.Cir. 1982). Here, the overwhelming contemporaneous evidence from Mr. Robinette and the government examiners indicated, contrary to Dr. Brumbaugh's analysis, that Franklin Federal did not have to pay more for deposits, when compared to its local competitors or the broader group of thrifts in its OTS region. The lack of any evidence to corroborate Dr. Brumbaugh's analysis is fatal to the plaintiffs' cost of deposits claim. Dr. Peltzman's critique of Dr. Brumbaugh's study simply confirms the problems in Dr. Brumbaugh's analysis. Without any contemporaneous documentation to support the cost of deposit claim, Dr. Brumbaugh's analysis is too speculative to support Franklin Federal's cost of deposit damage claim.

Franklin Federal contends that the absence of documentary evidence to support the claim should not be relevant. This view is unsupported. To the contrary, every court to examine the issue has rejected cost of deposit models that are not supported by contemporaneous evidence that confirms the claim. Thus, in *Southern Cal. Fed. Sav. and Loan Ass'n v. United States,* 57 Fed.Cl. 598 (2003) ("*SoCal*"), and *Coast Fed. Bank, FSB v. United States,* 48 Fed.Cl. 402 (2000), *rev'd,* 309 F.3d 1353 (Fed.Cir.2002), *vacated by,* 320 F.3d 1338 (Fed.Cir.2003), *aff'd en banc,* 323 F.3d 1035 (Fed.Cir.2003), similar claims were rejected for lack of proof. Given the documentary evidence to show that Franklin Federal was not experiencing any cost of deposits increase due to FIRREA, the claim fails for lack of evidence of causation. Dr. Brumbaugh's highly questionable statistical study is not enough to overcome the lack of con-

temporaneous proof. For all of these reasons, Franklin Federal's claim for cost of deposit damages is denied.

## IV. Dilution of the Seven Shareholders' Ownership Interests

■ The Seven Shareholders claim $5.875 million in damages for the alleged dilution of their original equity ownership interests in Franklin Financial and, through Franklin Financial, Franklin Federal. They contend these damages resulted from having to raise capital to comply with FIRREA-mandated requirements. The Seven Shareholders argue that but for FIRREA, they would not have needed to raise replacement capital for the lost supervisory goodwill, would not have done so, and would have continued to own 100% of Franklin Federal (through Franklin Financial) based on their original 500,000 shares. According to the Seven Shareholders, the difference between the amount they would have received on their original shares in 1996 as 100% owners of Franklin Financial and the portion of the total sale price they received for their original shares following the merger of Franklin Financial and UPC, is $5.875 million, and they claim that amount in damages.

In support of the Seven Shareholders' damage theory, the court heard testimony from six of the Seven Shareholders,[8] together with testimony from the plaintiffs' economic expert Dr. Rene M. Stulz. The Seven Shareholders also elicited testimony from Bill C. Houston, a former FDIC regulator, as well as the examiners and regulators called by the government. The Seven Shareholders also called Jackson Moore, Chairman of the Board, President and Chief Executive Officer of UPC.

In response to the Seven Shareholders' evidence, the government presented the testimony of Dr. Vincent A. Warther, the government's economic expert and several other government regulators and examiners, including, from the OTS, Mr. Gerbick, Mr. Mullane, Mr. Poe, Mr. Stringer and Mr. Doebereiner and, from the FDIC, Mr. Weakley.

---

8. All of the shareholders testified except for Mrs. Keener, Mr. Jesse's mother-in-law. Mrs. Keener is suffering from Alzheimer's disease and was not available to testify at trial. Her son-in-law, Mr. Jesse, testified on her behalf.

The testimony of the Seven Shareholders established that Franklin Financial purchased Morristown, converting it to Franklin Federal, on January 12, 1989, just seven months before enactment of FIRREA, on August 9, 1989. At that time, the Seven Shareholders believed that the deal they had entered into with the federal government, which included their agreement regarding their right to use goodwill[9] toward meeting their regulatory capital requirement, would not be affected by the legislation. Once the Seven Shareholders learned that FIRREA applied to their transaction and that Franklin Federal would not be in regulatory capital compliance, they sought and obtained an injunction in federal district court barring the government from enforcing the provisions of FIRREA against Franklin Federal.[10] The injunction remained in effect from July 16, 1990 through November 4, 1991, when the United States Supreme Court denied a writ of *certiorari* following the Sixth Circuit reversal of the trial court's decision. *Franklin Fed. Sav. Bank v. Director, OTS*, 927 F.2d 1332 (6th Cir.1991), *cert. denied*, 502 U.S. 937, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991).

Thereafter, Franklin Federal began negotiations with the OTS[11] regarding ways that Franklin Federal could meet the bank's obligations under FIRREA. Various discussions were held among Franklin Federal's management and OTS. In order to avoid immediate government action to seize the bank, Franklin Federal submitted a final "Capital Plan" with the OTS setting forth Franklin Federal's approach to achieving regulatory capital compliance by infusing capital into the bank. Eventually, this plan was incorporated into a "Capital Directive" issued by the OTS on June 19, 1992. The Capital Directive provided, in relevant part, as follows:

1. The Bank and its directors shall adhere to the Capital Plan submitted to the OTS on January 10, 1992, and revised on March 27, 1992 ("Capital Plan").

2. No later than ten days from the Effective Date of this Directive the directors of the Bank shall infuse into the Bank additional equity capital of not less than $500,000 cash....

3. Not later than September 30, 1992, the directors shall infuse additional capital in an amount, up to $500,000 ....

4. Not later than March 31, 1993, the Bank shall initiate a public offering or private placement of additional shares of the Bank's stock. No later than June 30, 1993, the Bank shall raise additional capital of an amount sufficient to increase the level of tangible capital to not less than 3 percent of adjusted total assets.

5. The Bank shall achieve compliance with 12 CFR Part 567 and any successor requirement by December 31, 1993.

As provided for under the Capital Directive, the first two capital infusions of $500,000 apiece were funded exclusively by the Seven Shareholders. Each of the Seven Shareholders put in an amount equal to their proportional share in Franklin Financial and they received additional shares of stock in Franklin Financial equal to their contribution. In order to meet their remaining obligations under the Capital Directive, Franklin Financial conducted a private placement, which brought an additional $1.735 million into the bank.

The history of the private placement was discussed by several witnesses, including Messrs. Robinette, Jarnigan, Haggard, and Jesse. According to their testimony, the Seven Shareholders decided the best way to raise the funds needed to comply with the Capital Directive would be for four of the Seven Shareholders to mortgage a warehouse that they owned directly or indirectly with seven other individuals and to infuse the proceeds into the bank. In accordance with various federal regulations, Franklin Federal sought and obtained the OTS's approval for

---

9. As discussed, the goodwill consisted of $9.4 million amortized over twenty-five years.

10. The injunction was sought by the Seven Shareholders, Franklin Financial and Franklin Federal.

11. Following the enactment of FIRREA the responsibilities of the Federal Home Loan Bank Board were transferred to the OTS, which in turn eventually turned over its responsibilities to the FDIC. During the transition period between regulation by the OTS and FDIC, both organizations had certain regulatory responsibilities.

this transaction. The Seven Shareholders decided that all of the individuals involved in the warehouse transaction would be given shares of stock in Franklin Financial in exchange for their contribution. The stock was valued at $8.50 per share. Through the private placement, Franklin Federal received an additional infusion of $1.734 million based on an $8.50 per share value.

The $8.50 price was set by investment bankers who were working with Franklin Financial in connection with the public offering of Franklin Financial stock. The evidence established that Franklin Financial had initially intended to conduct a public offering to raise all of the capital necessary for Franklin Federal to come into capital compliance under FIRREA, but that these plans were changed. Instead, the Seven Shareholders decided to conduct the private placement to obtain the funds necessary to bring the bank into capital compliance and to then conduct a public offering to raise additional resources for the bank. It was be-

lieved that the infusion of funds from the private placement would improve the likelihood of Franklin Financial reaching its financial goal in the IPO.

Following the private placement, the Seven Shareholders retained ownership of 85.1% of the stock. This percentage includes the shares that the Seven Shareholders received following the $1 million infusion as well as the shares they obtained in the private placement.

The evidence adduced at trial demonstrated that each of the Seven Shareholders had the financial worth to have paid for the shares themselves, but instead decided to sell the shares to the seven new shareholders following the private placement. The court heard testimony regarding the net worth of each shareholder and the amount of additional resources it would have taken for the shareholder to have maintained the same percentage of ownership in Franklin Financial in connection with the private placement:

| Shareholder Plaintiff | Net Worth | Net Worth Less Reported Investment in Franklin | Additional Investment to Maintain Percentage |
|---|---|---|---|
| Mr. Haggard | $5.5 million | $4.55 million | $ 73,366 |
| Mr. Jarnigan | $8.3 million | $7.36 million | $ 73,366.50 |
| Mr. Jesse | $1.9 million | $ 1.9 million | $ 22,691 |
| Mr. Jolley | $8.7 million | $ 7.9 million | $150,654 |
| Mrs. Keener | $1.8 million | $ 1.3 million | $175,946 |
| Mr. McGuffin | $3.5 million | $ 2.8 million | $510,243 |
| Mr. Robinette | $.54 million | $ .53 million | $ 35,189 |

Once the private placement was completed and the $1.735 million in capital was infused into Franklin Federal, Franklin Federal asked the OTS, on April 6, 1993, to lift the Capital Directive so that Franklin Financial could represent in the public offering prospectus that Franklin Federal was in capital compliance and not subject to any Capital Plan restrictions. On May 4, 1993, the Capital Directive was lifted by the OTS. More specifically, on May 4, 1993, the Regional Director of the OTS, Ronald N. Karr, wrote to Franklin Federal stating:

This letter is in response to your April 6, 1993 letter requesting release from the

June 19, 1992 Capital Directive.... In consideration of the capital position attained as a result of the recent infusion, as confirmed during our April 28, 1993 field visit, we are pleased to inform you that Franklin Federal is hereby released from the June 19, 1992 Capital Directive. However, should the institution fall out of compliance in the future, the capital plan process will be immediately re-initiated.... In addition, Franklin has achieved "adequately capitalized" status as defined in the FDIC Improvement Act of 1991 ("FDICIA"). Consequently, Franklin's ... capital restoration plan filed pursuant

to the Prompt Corrective Action provisions of FDICIA is no longer necessary and is considered withdrawn.[12]

After the Capital Directive was lifted, Franklin Financial proceeded with an IPO in July and August 1993, which resulted in a $2.703 million being infused into the bank. Several of the original Seven Shareholders invested in the public offering, including Messrs. McGuffin, Haggard, Jolley, Jarnigan, and Mrs. Keener. The evidence established that in order for the original Seven Shareholders to have maintained their same percentage of ownership in Franklin following the IPO, they would have had to invest the following amounts: Mr Haggard, $435,705; Mr. Jarnigan, $377,055; Mr. Jesse, $325,693; Mr. Jolley, $568,086; Mrs. Keener, $302,743; Mr. McGuffin, $782,763; and Mr. Robinette, $65,139.

Following the IPO, the Seven Shareholders held 62% of all Franklin Financial shares. However, if all of the *new* shares issued post-FIREAA are viewed as a percentage of the total Franklin Financial shares, the Seven Shareholders' original 500,000 shares now represented only 41.24% of the total number of Franklin Financial shares. As discussed below, it is the Seven Shareholders' contention that the breach caused approximately a 60% loss of their original equity interest.

The court heard conflicting testimony from the Seven Shareholders and government regulators as to whether the public offering was necessary once Franklin Federal achieved capital compliance. Several of the Seven Shareholders testified that it was their understanding that the public offering was necessary to ensure that Franklin Federal did not immediately fall out of capital compliance in each of the capital categories. The evidence established that, while Franklin Federal was in capital compliance at the time of the IPO, it faced a real risk of falling out of capital compliance with the result of the Cap-

ital Directive being re-initiated. Accordingly, the court finds, consistent with its earlier damages decision, that the Seven Shareholders may claim damages arising from the IPO.[13]

In 1996, three years after the IPO, Franklin Federal, through Franklin Financial, was merged with UPC in a transaction that resulted in every one share of Franklin Financial stock being traded for one share of UPC stock. The UPC stock was worth $17 at the time of the merger. Mr. Moore, the Chairman and President of UPC, testified regarding that merger. He specifically stated, however, that he did not have an opinion as to what Franklin Federal, or Franklin Financial, would have been worth if FIRREA had not been passed. He stated as follows:

> Defendant: Mr. Moore, you're not providing testimony here today about the price you would have paid for Franklin Federal if, instead of having a capital infusion three years earlier, it had supervisory goodwill on the books, are you?
>
> Mr. Moore: I think I'm testifying to what happened.... I only know what happened. I can't testify to what ... did not occur that I was not involved in. I don't think I can. I don't want to. I don't think I'm competent to.

Tr. at 961–62.

As noted above, the Seven Shareholders base their dilution claim on the fact that instead of receiving 100% of the value of Franklin Financial following the merger with UPC, the Seven Shareholders received only a portion of that value. The Seven Shareholders claim that they are entitled to 100% of the proceeds of what the bank would have been worth, but for the breach. They calculate that amount to be $17 per share for their original 500,000 shares, less the additional value the bank received from the infusions. The Seven Shareholders claim that this

12. Following enactment of FIRREA, the Congress enacted the FDIC Improvement Act of 1991, Pub.L. No. 102–242; 105 Stat. 2270, which put in place additional capital obligations on banks like Franklin Federal. At trial, the FDIC witness explained that Franklin was subject to the capital compliance requirements of the FDIC.

13. The court previously determined that the plaintiffs were entitled to replace more capital then was necessary to simply meet the regulatory threshold. *See Franklin II*, 55 Fed.Cl. at 126. In fact, the plaintiffs never replaced all of the lost supervisory goodwill. *Id.*

amount represents the value of their original shareholders' equity. As discussed below, this theory was developed and explained by the Seven Shareholders' economic expert, Dr. Stulz.

Dr. Stulz, who holds a Ph.D. in economics from the Massachusetts Institute of Technology and is the current Chair of Money and Banking at Ohio State University, explained that his damage model measured the dilution of the Seven Shareholders' equity value in Franklin Federal, through Franklin Financial, by virtue of the breach. Dr. Stulz endeavored to determine the equity the Seven Shareholders would have had in Franklin Federal had Franklin Financial not increased the number of shares following the breach. In Dr. Stulz's view, the difference between the equity the original Seven Shareholders would have had without the breach compared to the equity they received from the UPC on those original shares represented the damages the Seven Shareholders sustained following the breach.

To determine the amount of "dilution" damages, Dr. Stulz saw his task as determining the value of the Seven Shareholders' original equity in Franklin Financial in the "but for world." According to Dr. Stulz, he needed to first find a fair market value for Franklin Financial in a "but for world." He determined that the merger price for Franklin Financial stock or $17 was the best indication of fair market value absent any breach. He, thus, started his analysis with the $20.6 million Franklin Financial received from the merger. He explained that in order to find the value of the Seven Shareholders' original equity but for the breach, he needed to back out of the bank's $20.6 million value the $5.437 million in post-breach infusions the bank had received from both the original Seven Shareholders and new investors.

Dr. Stulz testified that he also needed to account for the earnings the bank received on post-FIRREA infusions. Dr. Stulz stated that his review of Franklin Federal's records revealed that the new capital infused into the bank was largely placed in investments that yielded between 4.625% and 7%. Dr. Stulz claimed that he conservatively estimated that the infusions had been placed in investments

yielding returns at the thirty-year Treasury rate. Applying that rate to the infusion, Dr. Stulz concluded that the he had to account for $792,000 in income. He explained that the value of the breach infusions ($5.437 million) plus the reinvested earnings ($792,000) equaled $6.229 million. He then subtracted this amount from the $20.6 million which yielded $14.371 million.

According to Dr. Stulz, but for the breach, the bank would have worth $14.371 million. Dr. Stulz opined that, but for the breach, the Seven Shareholders would have received 100% of that amount. Dr. Stulz explained that in the actual world the Seven Shareholders received only $8.496 million on their original 500,000 shares as part of the 1996 UPC merger. Dr. Stulz concluded that the damage to the Seven Shareholders is the difference between the $14.371 million the Seven Shareholders would have received on their original 500,000 shares but for the breach, less the $8.496 million they did receive on their 500,0000 shares, for a total of $5.875 million.

In fact, the Seven Shareholders received $12.834 million upon the merger, if all of their shares were counted. Dr. Stulz claimed that in his theory he did not include the full amount the Seven Shareholders received because he was endeavoring to show the dilution of equity on the original shares only. Dr. Stulz explained that he did not have to account for the additional money the Seven Shareholders received on the additional shares they obtained, because they could have made money elsewhere had they not invested additional money into Franklin Financial and, thus, it cannot be considered in determining the damages on the original 500,000 shares.

In addition to the $5.875 million claimed above, Dr. Stulz also testified that the Seven Shareholders are entitled to the $726,000 in dividends Franklin Financial paid out on the additional shares issued in 1992 and in the 1993 private placement and IPO. The $726,000 figure includes the dividends paid to the Seven Shareholders on the additional shares they acquired in 1992 and 1993, even though the Seven Shareholders who purchased additional shares, in fact, received

dividends on the shares they acquired after 1992. Dr. Stulz contended that including those dividend payments in a damage award is fair because, absent FIRREA, the Seven Shareholders would not have infused more money into Franklin Financial and the dividends paid on their additional shares correspond to dividends taken away from the original shares. Dr. Stulz's model apparently assumes that the same amount of dividends would or could have been paid in the "but for world" as were paid in the real world.

On cross-examination Dr. Stulz acknowledged that the Seven Shareholders received over 60% of the proceeds from the UPC merger and that if the court were to consider the payment the Seven Shareholders received for all of their shares in Franklin Financial, their damages would be significantly diminished. In particular, government counsel had Dr. Stulz go through an exercise where he deducted the $12.834 million the Seven Shareholders, in fact, received from the $14.371 million Dr. Stulz said the bank would have been worth, but for the breach. This resulted in only $1.537 million in damages from the sale of Franklin Financial.[14]

During cross-examination Dr. Stulz applied this same correction to the dividends received by the Seven Shareholders. If the dividend damage is corrected to account for the 62% of dividends actually received by the Seven Shareholders, the amount of dividend damages is $470,060. This is the amount of Franklin Financial dividends paid to others.

On cross-examination the government also questioned Dr. Stulz at length regarding his reliance on the 1996 UPC price as the fair market price for Franklin Financial in the "but for world," absent FIRREA. The government presented Dr. Stulz with charts showing that stock prices for thrifts increased dramatically nationwide between 1993 and 1996, and that Dr. Stulz had not accounted for this or other factors in selecting the $17 value. In particular, the government showed Dr. Stulz several charts of financial data which indicated that stock prices for thrifts across the country had generally increased over 95% from 1993 to 1996, and that thrifts, in the southeastern United States, like Franklin Federal, saw a 131% stock price increase for the same period. Dr. Stulz explained that there was no reason to account for general market conditions or other factors in selecting the $17 price. In his view the UPC offer represented the best indication of the value of Franklin Federal in the "but for world," because $17 was the price that a willing buyer and seller had agreed upon.

In this connection, the government also questioned Dr. Stulz as to why the $8.50 paid for Franklin Financial stock at the public offering did not represent fair market value. The government challenged Dr. Stulz's contention that $8.50 was not a fair market price. First, the government argued that independent investor bankers had set the $8.50 price as a fair market price. Second, several of the Seven Shareholders had indicated that $8.50 was a market price on their financial forms, and Mr. Jesse, one of the shareholders, acknowledged it was the price a willing buyer was willing to pay for the stock. Dr. Stulz explained that he had rejected the $8.50 price because the Seven Shareholders could not freely sell their shares for $8.50 at the time of the IPO. In support of this view, the Seven Shareholders introduced the OTS September 1993 report which stated that "since the stock is not actively traded, the market value . . . cannot be readily ascertained." Dr. Stulz opined that a fair market price was not set until the UPC sale, three years later in 1996. Dr. Stulz agreed that if the Franklin Financial stock had not increased in value but had remained at $8.50 per share, that the Seven Shareholders would not have suffered any "dilution" damages under his model.

14. When the government's expert, Dr. Warther, performed the same correction he concluded that the amount of damage would be $4.050 million. Dr. Warther testified, without agreeing with assumptions made in Dr. Stulz's model, that the original Seven Shareholders would need to be given credit for the $2.118 million they infused into the bank and for the $333,000 on earnings from that infusion. Dr. Warther, therefore, substantially modified government counsel's argument on this point.

In response to the Seven Shareholders' evidence on dilution damages, the government offered the testimony of Dr. Warther, who holds a Ph.D. from the University of Chicago Graduate School of Business and is currently the Vice President of Lexecon, Inc., a consulting firm. Dr. Warther testified that Dr. Stulz's dilution theory was inconsistent with established principles of corporate finance and does not appear as a damage theory in any of the literature on financial damages. First, Dr. Warther explained that to the extent Dr. Stulz was modeling "dilution" of ownership, dilution of ownership is only recognized in connection with shares of stock that are issued to outside investors. Dr. Warther stated there was no support for a dilution of ownership model based on simply issuing new "shares" to the same owners. According to Dr. Warther, so long as the same owners retain the new shares, their ownership is not "diluted." Dr. Warther opined that because the Seven Shareholders retained their proportional ownership interest following the 1992 infusions, there was no "dilution" following those infusions, and that the original Seven Shareholders only had their "ownership interest" diluted after the private placement and IPO. Second, Dr. Warther testified that while there can be "dilution" of ownership when new shares are sold, there is no such thing as "dilution damages." According to Dr. Warther selling new shares does not cause damage because the infusion to the corporation creates a corresponding increase in value. Thus, while the Seven Shareholders' percentage of ownership may fall, the overall equity increases, and, thus, the Seven Shareholders' original equity retains the same value. In such circumstances, Dr. Warther explained there is no "economic" harm caused by selling additional shares of stock.

Dr. Warther further testified that to the extent the Seven Shareholders did not receive all of the proceeds from the UPC merger, that loss of proceeds was due to Franklin Financial's independent business decision to offer common stock to raise the needed capital. According to Dr. Warther, if the Seven Shareholders had wanted to avoid dilution of their ownership interest, there were a variety of other ways Franklin Financial could have raised money that would not have resulted in a loss of the Seven Shareholders' original ownership percentage. Among the techniques that Franklin Financial could have used was the issuance of different classes of stock, the use of loans, or the issuance of preferred stock. Dr. Warther opined that he believed the reason the Seven Shareholders, through Franklin Financial, decided to raise additional capital through common stock was to spread the risk of losing money, in the event that Franklin Federal did not perform well. Moreover, Dr. Warther explained that given the net worth of each of the original Seven Shareholders, each could have avoided any "dilution" of their ownership interest by buying all of the outstanding shares themselves.

Dr. Warther also testified that Dr. Stulz's assumption that the UPC $17 per share represented the fair market value of Franklin Financial in a "but for world" was not supported. Dr. Warther stated that Dr. Stulz had failed to properly consider other market forces in effect at the time of the UPC merger, including the fact that stock in southeastern thrifts had increased over 100% from 1993 to 1996. Indeed, Franklin Financial's stock increased 100% from 1993 to 1996, from $8.50 to $17 per share. In addition, Dr. Warther stated that UPC likely had paid a premium to buy Franklin Federal because UPC had a unique interest in expanding in the region. According to Dr. Warther, acquisition premiums can range from 20% to 30%. Dr. Warther opined that Dr. Stulz's failure to consider these factors rendered Dr. Stulz's opinion as to the value of Franklin Financial stock in a "but for world" was wholly speculative.

After careful consideration of the testimony and exhibits at trial, the court concludes that the Seven Shareholders' dilution damage claim is based on a flawed dilution theory. As discussed below, Dr. Stulz's model erroneously fails to account for the full amount the Seven Shareholders received on their investment and when his theory is taken to its logical conclusion it leads to absurd results. The court simply cannot accept a dilution model that would have these Seven Shareholders suffer the same damage if they had

in fact retained 100% control of Franklin Financial after FIRREA. In addition, even if the model is corrected to account for the full amount the Seven Shareholders received on their investment, Dr. Stulz's model is nonetheless premised on the speculative assumption that Franklin Financial stock would have been worth $17 per share but for the breach. Dr. Stulz failed to adequately explain why the $8.50 IPO price was not a valid fair market price for the stock and failed to consider how other market forces between 1993 and 1996 might have significantly affected Franklin Financial's stock price. The court found nothing in evidence to support Dr. Stulz's assumption that the 100% increase in Franklin Financial stock from 1993 to 1996, in a "but for world," would be accounted for by Franklin Federal's performance alone, without regard to any outside market forces.

Turning first to Dr. Stulz's dilution model, the court agrees with the government that Dr. Stulz's model does not provide the court with a proper measure of "dilution" damages. Here, Dr. Stulz does not purport to measure the dilution of the Seven Shareholders' ownership interest; instead, he endeavors to measure the dilution of original equity shares. Importantly, he is not measuring the loss attributable to the Seven Shareholders by having to share profits with outside "shareholders," but the loss sustained by having failed to get the alleged full value of their original *shares*. The government correctly notes that there is nothing in the literature regarding "dilution" of stock which suggests that the value of the original share equity can be damaged in this way.

Under Dr. Stulz's model, the Seven Shareholders' original 500,000 shares in Franklin Financial were diluted by nearly 60% following the capital infusions. Importantly, Dr. Stulz includes in his damages the amount of shares the Seven Shareholders received for their two infusions of $500,000, as well as the shares they received during the private placement and purchased during the IPO. Under Dr. Stulz's model it does not matter who purchases the new shares. Indeed, the damage is the same if the Seven Shareholders purchased all of the new shares.

More specifically, Dr. Stulz states that the Seven Shareholders' loss is attributable to the fact that they would have received 100% of the value of Franklin Financial, but for the breach, but that they did not get all of that value when they effectively sold their shares in 1996 for $17 to UPC. Using the $17 share price, Dr. Stulz opines that Franklin Federal but for the breach would have been worth over $14 million, once he backs out the value of the infusions. He then reasons that the Seven Shareholders' original shares equaled only 41% of Franklin Financial after the goodwill was replaced, hence their damage is $6 million, the difference between the value of 100% ownership of the original equity ($14 million), and the amount attributable to the 41% of the original shares in Franklin Financial ($8 million).

Dr. Stulz's model does not consider the Seven Shareholders' additional shares because those shares are not relevant to his theory. In Dr. Stulz's view, even if the Seven Shareholders had purchased all of the post-FIRREA shares and had, thus, received the full $20.6 million from the UPC merger, they still "lost" $6 million on their original share equity. For the same reason, Dr. Stulz's model also ignores the fact that the Seven Shareholders made a substantial profit after replacing the lost supervisory goodwill.

In the court's view, Dr. Stulz's model defies common sense and cannot be accepted. Dr. Stulz's dilution model is contrary to established principles of "dilution" theory. Dr. Stulz's failure to account for the additional shares purchased by the Seven Shareholders is simply unsupportable. The Seven Shareholders received a substantial benefit from the infusions. The stock they obtained from their infusions doubled in three years. As noted above, in connection with the reliance claim, the court cannot ignore the benefit these Seven Shareholders obtained from their mitigation efforts. *LaSalle Talman,* 317 F.3d at 1373 ("[T]he Court of Federal Claims correctly held that benefits achieved ... after the breach should be included in mitigation of damages."). Dr. Stulz's failure to account for any benefit renders his opinion unpersuasive. For all of these reasons, the court cannot accept Dr. Stulz's model as a

proper measure of damage for the loss sustained by the Seven Shareholders in having to replace their supervisory goodwill with capital. The Seven Shareholders' claim for $5.4 million in damages based on the dilution of their original shares as measured by Dr. Stulz is denied.[15]

The plaintiffs' reliance on *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348 (Fed.Cir.2001), to support their dilution model is misplaced. It is true that the *Bluebonnet* court recognized that the lost ownership share can be a cost of financing the capital infusions needed to replace the supervisory goodwill. However, as discussed above, Dr. Stulz does not purport to measure lost ownership share. Dr. Stulz's model is not based on having lost equity to other investors. *Bluebonnet* does not endorse Dr. Stulz's approach.

Moreover, and of greater importance, however, is the fact that, even if the court were to correct for Dr. Stulz's model and adjust for the additional payments made to the Seven Shareholders for their new shares, Dr. Stulz's model must still be rejected. In the court's view, Dr. Stulz's model suffers from the fundamental problem that it is based on the speculative assumption that Franklin Financial stock would have been worth $17 per share in the "but for world." As discussed above, the facts established that Dr. Stulz did not adequately explain why the $8.50 IPO price was not a fair market price. In addition, Dr. Stulz failed to adequately account for other market forces in settling on the $17 price for Franklin Financial stock in the "but for world." He did not consider the overall increase in thrift stock prices from 1993 to 1996, he did not consider the $8.50 IPO price or the fact that UPC likely paid a premium for Franklin Federal. The statements by the OTS to the effect that there was no active trading on Franklin Financial stock and, therefore, no sense of its value, does not alter this conclusion. Clearly, Franklin Financial was able to establish a market for its shares during the IPO or none would have been sold. In such circumstances, the record

does not support the $17 stock price which is at the core of Dr. Stulz's damage model.

It is for these reasons that the Seven Shareholders' reliance on *SoCal*, 57 Fed.Cl. 598 and *Strougo v. Bassini*, 112 F.Supp.2d 355 (S.D.N.Y.2000) is misplaced. Both cases recognize the significant burden placed on the plaintiffs to establish a fair market price. In *SoCal*, for example, the court expressly found that the IPO price was a fair market price. 57 Fed.Cl. at 636. Here, of course, Dr. Stulz does not accept the IPO price. Rather, he asks the court to examine a price paid for the stock three years after there were significant market changes. In *SoCal*, the court refused to select a price that was not contemporaneous with the breach, because it could not account for market forces. *Id.* Similarly, in *Strougo*, the court rejected the plaintiffs' damages based on a stock price measured three years after the breach. 112 F.Supp.2d at 369 ("Both methods Strougo uses to value loss depend on a three-year interval that has no bearing on the actual loss .... Strougo offers no support [that] ... stock prices three years after the Rights Offering were a product of the Rights Offering itself rather than other, subsequent market forces."). Here, as well, it was clear that market forces impacted on the $17 price. The evidence established that all stocks in the industry had increased by 100% from 1993 to 1996 and that a premium was likely paid by UPC for the stock.

In sum, because the court finds that the $17 stock price Dr. Stulz assigned to Franklin Financial in the "but for world" is not reliable, Dr. Stulz's model is too speculative to support a damage award. As Dr. Stulz himself conceded, if the fair market value of Franklin Financial shares, but for the breach, were only $8.50, the Seven Shareholders did not suffer any dilution damages. Here, the court cannot be certain that Franklin Financial stock would not have been worth $8.50 per share in 1993 irrespective of the breach. Moreover, the court is convinced that it would not have been worth $17 per share.

---

**15.** Having concluded that the Seven Shareholders' damage theory does not survive judicial scrutiny, it is not necessary for the court to opine

with regard to the government's other objections to Dr. Stulz's analysis.

Next, the court turns to the Seven Shareholders' dividend loss claim. Here, the court finds the government's contention that the Seven Shareholders did not suffer dilution damages from having to share dividends lacking in merit. The government's contention that the Seven Shareholders could have avoided dilution damages altogether if Franklin Financial had selected another financing route is not persuasive. The court finds that Franklin Financial's decision was reasonable. *See Long Island Sav. Bank, FSB v. United States,* 60 Fed.Cl. 80, 90, 2004 WL 392911 at *8 (Fed.Cl.2004) (citations omitted) ("[Reasonableness of mitigation efforts] 'is to be determined from all the facts and circumstances of each case ....' "). While Franklin Financial may have had other options, seeking outside capital was not unreasonable. Indeed, in several *Winstar*-related cases the amounts needed to replace goodwill were so great that resorting to the capital markets was the only option.

In addition, the government's contention that the Seven Shareholders could have avoided any damage by purchasing all of the new shares is rejected. There is no requirement that wealthy individuals must exhaust their own resources before they can claim dilution damages. The Seven Shareholders personally contributed over 60% of the capital in Franklin Financial. The court finds that the Seven Shareholders acted reasonably in not purchasing all of the newly issued shares. Moreover, the government's assumption that, had the Seven Shareholders purchased all of the outstanding shares they would not have suffered any damage, is not correct. For example, it was clear from the evidence that the Seven Shareholders would have had to borrow funds to purchase all shares and then there would have been interest payments to consider. In short, here, the Seven Shareholders acted reasonably in acquiring some but not all of those new shares. This resulted in dilution damages to the Seven Shareholders.

In particular, the evidence established that Franklin Financial paid dividends on its stock from 1993 to 1996. While the Seven Shareholders received the benefit of the dividends they received on both their original and new shares, the dividends paid to others was a real loss to them. The dilution damage is based on the uncontested assumption that these same dividends would have been generated in the "but for world" and that instead of receiving all of the dividends, the Seven Shareholders had to share the dividends with others.

Importantly, the government never offered any evidence to suggest that there would not have been the same amount of dividends without the infusions occasioned by the breach. The court therefore can infer that the same amount of dividends would have been generated in the "but for world," without a breach. In fact the only specific objection the government raised with respect to Dr. Stulz's dividend theory concerned his failure to account for the dividends the Seven Shareholders received on their new shares. Dr. Warther, the government's damage expert, did not even discuss Dr. Stulz's dividend damage theory in his testimony. The court therefore finds that the Seven Shareholders are entitled to $470,060 for the dividend payments they would not have had to share with others but for the breach.

## V. Stock Options of Charles G. Robinette

Mr. Robinette claims damages for stock options he held in Franklin Financial but allegedly did not exercise because FIRREA rendered the options worthless. The testimony established that under the three-year employment contract he signed with Morristown in March 1988, as amended in July 1988, which made him the bank's President and Chief Executive Officer, Mr. Robinette had the option to buy up to 4% of the holding company's outstanding stock at the price of $10 per share.[16] Mr. Robinette testified that he had intended to exercise the options, but that FIRREA's elimination of supervisory goodwill left Franklin Federal insolvent and, thus, he argued he was robbed of his options. Mr. Robinette explained that he always exercised options that were "in the money," i.e., worth more than the option

---

16. Mr. Robinette acquired an initial 2% interest in Franklin Financial through the purchase of stock at the time of the supervisory conversion and acquisition of Morristown in January 1989.

price. He testified that his 1989 options would have been "in the money" but for the breach. He stated that he believed that Franklin Federal would have been profitable and, thus, Franklin Financial stock would have been worth more than $10 per share. He explained that he based this conclusion on the thrift's actual performance. Accordingly, Mr. Robinette testified that by the end of the option period, i.e. by March 1991, he would have owned an additional 20,833 shares of Franklin Financial stock, which would have entitled him to more profit at the time of the UPC merger.

In particular, Mr. Robinette claims that he would have been entitled to 4% of the "but for world" price of Franklin Financial stock or a net profit of $366,852. Mr. Robinette supported this claim with the testimony of Dr. Stulz. Dr. Stulz valued Robinette's stock options that expired in March 1991 based on the UPC merger price. Dr. Stulz never offered a value for Franklin Financial stock in March 1991, at the time the options expired. Dr. Stulz simply assumed that Mr. Robinette's shares would have been in the money and, therefore, Mr. Robinette would have exercised his options.

On cross-examination, Dr. Stulz acknowledged that there is a well-known and accepted model for determining the value of stock options, known as the "Black–Scholes" model. Dr. Stulz explained that he did not use the Black–Scholes model because it is difficult to use when a stock is not actively traded. He conceded that it was not impossible to do a Black–Scholes analysis in such cases. However, he explained that a Black–Scholes analysis in those cases is vulnerable to attack. Thus, Dr. Stulz explained, he decided instead to rely upon the UPC price. Accordingly, the sole evidence to support a finding that Mr. Robinette's options would have been in the money in March 1991 was the 1996 UPC price for Franklin Financial stock and Mr Robinette's good faith belief that Franklin Federal would have done well, but for the breach.

To determine Mr. Robinette's precise damages, Dr. Stulz used the same dilution model he had used to show the Seven Shareholders' dilution damages. Dr. Stulz opined that Mr.

Robinette would have owned 4% of Franklin Financial and would have, thus, received $574,852 for his share of the "but for" value of Franklin Financial or 4% of $14.371 million. Because the options would have cost him $208,330, his damages would be $366,522.

The government presented the testimony of Dr. Warther in response to Mr. Robinette's claim. Dr. Warther explained that Dr. Stulz's theory regarding Mr. Robinette's stock option damages would result in a windfall to Mr. Robinette. Dr. Warther also explained that Mr. Robinette could have mitigated against this loss had he bought additional shares at $8.50 per share during the IPO. He also noted that if Mr. Robinette's option shares are included in Dr. Stulz's dilution model, the dilution of other shareholders' equity would have to be recalculated.

The court finds that Mr. Robinette's stock option claim is too speculative to support an award. For this reason, the court does not reach the government's threshold argument that Mr. Robinette's claim fails as a matter of law under *Maher v. United States*, 314 F.3d 600 (Fed.Cir.2002), *cert. denied*, —— U.S. ——, 124 S.Ct. 133, 157 L.Ed.2d 40 (2003) (holding that the government is not liable for breach of contract for lost compensation to officers and directors caused by FIRREA). According to the government, the vague references to Mr. Robinette's options in the conversion agreement did not give rise to a contractual obligation. Mr. Robinette argues in response that this court previously held that Mr. Robinette had a potential claim for lost options. Regardless of whether Mr. Robinette had a contract with the government concerning his options, he failed to establish that his failure to exercise the options was due to the breach.

Although Mr. Robinette asserts that he would have exercised the options he received in 1989 to the fullest extent permitted before the expiration of those rights in March 1991, there was no credible evidence presented to support this claim. There is simply insufficient evidence before the court to support Mr. Robinette's assertions that but for the breach, Franklin Financial stock would have been "in the money" in March 1991. Despite Mr. Robinette's confidence in Franklin Fed-

eral, the thrift's performance during the years prior to its supervisory conversion was very shaky. Franklin Federal did not have a historically strong earnings record on which to base confident predictions about its future success. Moreover, the evidence regarding Franklin Federal's real world performance in 1990 and early 1991 does not show that Mr. Robinette's options would have been "in the money" in March 1991. Mr. Robinette's testimony regarding the stock price in this regard is pure speculation.

In this connection, Dr. Stulz's failure to use the accepted Black–Scholes model to establish an option price confirms the court's suspicion that it is not likely that Mr. Robinette's options, but for the breach, would have been "in the money" before they expired. Moreover, the court cannot accept Dr. Stulz's assumption that $17 per share would have been anything near what Franklin Financial would have been worth within two years after the conversion.

In sum, without any sufficient evidence to support Mr. Robinette's claim that his stock options would have been worth more than $10 per share within two years after the conversion, Mr. Robinette's stock option damage claim must be rejected.

## CONCLUSION

Based on the findings of fact and conclusions of law set forth above, the Clerk shall enter judgment for the plaintiffs in the following amounts: Mr. Haggard, $68,158.70; Mr. Jarnigan, $68,158.70; Mr. Jessee, $47,006.00; Mr. Jolley, $94,012.00; Mrs. Keener, $47,006.00; Mr. McGuffin, $136,317.40; Mr. Robinette, $9,401.20; Franklin Financial, through its agent Wyatt, Tarrant & Combs, LLP, $217,630.79; Franklin Federal, through its agent Wyatt, Tarrant & Combs, LLP, $109,016.83. Each party shall bear its own costs.